

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-9-2008

# Pierre v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-2496

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Pierre v. Atty Gen USA" (2008). *2008 Decisions.* Paper 946.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/946

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-2496

———

PAUL PIERRE,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

_____

On Petition for Review from
the Board of Immigration Appeals
BIA No: A93-021-438
Immigration Judge: Daniel A. Meisner

_____

Argued En Banc: February 26, 2008

Before: SCIRICA, Chief Judge, SLOVITER, McKEE,
RENDELL, BARRY, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, HARDIMAN, and GARTH, Circuit
Judges.

(Filed:  June 9, 2008 )

Rebecca Sharpless (Argued)
Florida International University
Clinical Program, College of Law
University Park
Miami, FL 33199

Attorney for Petitioner

Steven A. Morley (Argued)
Thomas M. Griffin
Morley, Surin & Griffin
325 Chestnut Street, Suite 1305-P
Philadelphia, PA 19106

Amicus Curiae for the Court

Thomas H. Dupree, Jr. (Argued)
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

David E. Dauenheimer
Richard M. Evans
Susan K. Houser
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

Attorneys for Respondent

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>, joined by SCIRICA, SLOVITER,
BARRY, SMITH, FISHER, CHAGARES, JORDAN,
HARDIMAN, and GARTH, <u>Circuit Judges</u>.

We ordered rehearing *en banc* in this case to determine the
level of intent required, under the Convention Against Torture (the

"CAT"),[1] for an applicant to show that he is more likely than not to be tortured if sent to the proposed country of removal. Paul Pierre, who is restricted to a liquid-only diet because of a self-imposed injury to his esophagus, appeals the decision of the Board of Immigration Appeals ("BIA") denying him CAT relief, claiming that as an ex-convict he will be imprisoned upon his deportation to Haiti, will not be provided with the necessary medical care and diet he requires, and will likely die as a result. He contends that the prison officials' knowledge that it is practically certain that he will suffer severe pain if imprisoned in Haiti is sufficient for a finding of specific intent to torture under the CAT. The government, on the other hand, argues that the jailer's knowledge that an action might cause severe pain and suffering is not sufficient for a finding of specific intent. We conclude that Pierre is not entitled to relief under the CAT because he is unable to sustain his burden of proof to show that, by imprisoning him, the Haitian authorities have the specific intent to torture him. Accordingly, we will deny his petition.

I.

Pierre, a Haitian citizen, first entered the United States in 1986 and was granted permanent legal resident status on December 1, 1990. On October 14, 1992, Pierre broke into the home of his ex-girlfriend and stabbed her repeatedly with a meat cleaver. When a neighbor interrupted the attack after hearing the victim's cries, Pierre drank a container full of battery acid, in an attempt to commit suicide. His suicide attempt was unsuccessful, however, and due to his ingestion of the battery acid, Pierre suffers from a condition called esophageal dysphagia, limiting him to a liquid diet administered through a feeding tube. According to Pierre, the

---

[1] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, Tit. XXII, § 2242, 112 Stat. 2681, 2681-761, 2681-822 (codified as a note to 8 U.S.C. § 1231).

feeding tube must be replaced on a monthly basis and he requires daily medical care.

Following a trial by jury, Pierre was convicted of various crimes for his attack on his ex-girlfriend, including attempted murder, and was subsequently sentenced to 20 years imprisonment with a mandatory minimum of 10 years without parole. After he had served his 10-year minimum, the former Immigration and Naturalization Service filed a Notice to Appear charging Pierre with being deportable under INA § 237(a)(2)(A)(iii), for having been convicted of an aggravated felony.

According to the 2006 State Department Country Report for Haiti (the "Country Report"), Haiti detains its citizens deported by reason of prior convictions in a foreign country. These detentions sometimes last several months and the Haitian government justifies its detention policy on the grounds of public safety. The Country Report indicates that the prisons are overcrowded, poorly maintained, unsanitary, and rodent infested. Prisoners suffer from malnutrition, inadequate health care, and a lack of basic hygiene.

At a hearing before the Immigration Judge ("IJ"), Pierre conceded that he was subject to removal for his conviction,[2] but applied for relief under the CAT, asserting that he would not survive in the Haitian prison for more than two or three weeks. In his written CAT application, he explained that he feared that if he was returned to Haiti he would "die for lack of medical care" while in prison because of the Haitian detention policy. (App. 122.) Pierre described the "expected failure of Haitian authorities . . . to provide [him with] adequate medical attention" as "t[a]ntamount to . . . torture." (App. 123.)[3] He did not attribute this expected

---

[2] At his initial hearing, where he appeared *pro se*, he testified that he "d[id]n't have any problem going back" to Haiti. (App. 41.)

[3] The government does not dispute that Haitian prison officials would not be able to provide Pierre with his liquid diet and regular medical attention while he remains in detention. It is not clear from the record how long Pierre would remain imprisoned

4

failure to any ill will on behalf of the Haitian authorities. Rather, Pierre claimed that "Haiti does not have the means . . . to care for [his] medical condition." (App. 123.) He appealed to the IJ to make a legal "exception" in his case, "notwithstanding any statutory bar to relief, . . . for humanitarian reasons." (App. 127.)

The IJ found that Pierre was seeking relief for humanitarian reasons based on his medical needs. The IJ concluded that under the interpretation of the CAT in Auguste v. Ridge, 395 F.3d 123 (3d Cir. 2005), he did not have discretion to grant humanitarian relief. Accordingly, the IJ denied Pierre's application for deferral of removal. A single member of the BIA affirmed the IJ's decision without opinion. Pierre appealed the BIA's decision to this court.

Subsequent to the initial briefing in this case, we decided Lavira v. Attorney General, 478 F.3d 158 (3d Cir. 2007). In Lavira, a panel of our court granted a CAT claim based on evidence that severe pain was the "only plausible consequence" of a petitioner's imprisonment in a Haitian prison. Id. at 170. In that case, the panel stated that a jailer's "willful blindness" or "deliberate indifference" might be enough to satisfy the specific intent requirement of the CAT. Id. at 171. The original panel in this case asked for supplemental letter briefs on the impact of Lavira on Pierre's case. After receiving the letter briefs and hearing oral argument, we voted to hear the case *en banc* to resolve any conflict between Auguste and Lavira.

II.

In this matter, Pierre petitions for review of the final order of removal by the BIA. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). Because the basis for removal is Pierre's conviction for an aggravated felony, our jurisdiction is limited under the REAL ID Act to "constitutional claims or questions of law." Id. § 1252(a)(2)(C)-(D).

Where, as here, the BIA affirms an IJ's decision without

---

once returned to Haiti.

opinion, we review the IJ's decision as the final agency determination. Berishaj v. Ashcroft, 378 F.3d 314, 322 (3d Cir. 2004). We will review the IJ's legal determinations *de novo*, subject to the principles of deference articulated in Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844 (1984). See Briseno-Flores v. Att'y Gen., 492 F.3d 226, 228 (3d Cir. 2007); Wang v. Ashcroft, 368 F.3d 347, 349 (3d Cir. 2004). Under the REAL ID Act, factual or discretionary determinations are outside of our scope of review. Sukwanputra v. Gonzales, 434 F.3d 627, 634 (3d Cir. 2006).

III.

The CAT was designed to acknowledge the obligation of nations under the United Nations Charter to "promote universal respect for, and observance of, human rights and fundamental freedoms." See Preamble to Convention, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. It was adopted by the United Nations General Assembly on December 10, 1984, and entered into force on June 26, 1987, to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Id. Since opening for signature in December 1984, 145 countries have signed and/or become parties to the CAT. See Office of the High Commissioner for Human Rights Page on the Status of the CAT (visited May 21, 2008) (http://www2.ohchr.org/english/bodies/ratification/9.htm).

> Article 1 of the CAT defines torture as:
> [A]ny act by which severe pain or suffering, whether physical or mental, is *intentionally inflicted* on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from,

6

inherent in or incidental to lawful sanctions.

Art. 1(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (emphasis added). The CAT then commands that: "No State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

President Reagan signed the CAT on April 18, 1988, in accordance with the power granted to the President in Article II, Section 2 of the United States Constitution, and reserved the United States' right "to communicate, upon ratification, such reservations, interpretive understandings, or declarations as are deemed necessary." See Auguste, 395 F.3d at 130 (citation omitted). President Reagan then transmitted the CAT to the Senate for advice and consent on May 20, 1988, proposing a list of reservations, understandings, and declarations, which were revised and resubmitted by President George H. W. Bush in January 1990. See Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 2, 7-8 (1990). Included in this list, was an understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." Id. at 9, 36. In addition, President Bush included an understanding that the CAT prohibition on returning a person to a country "where there are substantial grounds for believing that he would be in danger of being subjected to torture," Art. 3(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, would be interpreted to mean "if it is more likely than not that he would be tortured." See S. Exec. Rep. 101-30, at 10, 16, 36. President Bush also included a declaration that the CAT is not self-executing, to clarify that implementation of the CAT would be through separate legislation. See id. at 12, 37.

In October 1990, the Senate adopted a resolution of advice and consent that incorporated the understandings and declaration discussed above. See 136 Cong. Rec. S17486-01, S17491-92 (Oct. 27, 1990) ("Senate Resolution"). Next, as required by Article 26 of the CAT, President Clinton deposited the instrument of

ratification with the United Nations on October 21, 1994, and the CAT became enforceable in the United States 30 days later.[4] See Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999). President Clinton included the reservations, understandings, and declarations from the Senate Resolution in the instrument of ratification. See 1830 U.N.T.S. 320, 320-22 (1994).

Because the CAT did not self-execute, it needed to be "implemented by legislation before [giving] rise to a private cause of action." Ogbudimkpa v. Ashcroft, 342 F.3d 207, 218 (3d Cir. 2003) (quoting Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir. 1979)); see also Auguste, 395 F.3d at 133 n.7. Accordingly, in 1998, Congress passed legislation to implement the United States' obligations under the CAT: the Foreign Affairs Reform and Restructuring Act ("FARRA"). See Pub. L. No. 105-227, Div. G, Tit. XXII, § 2242, 112 Stat. 2681, 2681-761, 2681-822 (codified as a note to 8 U.S.C. § 1231).[5]

The first section of FARRA, § 2242(a), announces that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture," thereby adopting the obligation in Article 3 of the CAT. See id. Next, § 2242(b) directed "the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of [the CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of [the CAT]." Id.

---

[4] Article 26 of the Convention states, in pertinent part: "Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations." See Art. 26, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

[5] As discussed in Auguste v. Ridge, 395 F.3d 123, 133 n.7 (3d Cir. 2005), technically Pierre's claim is a FARRA claim, but we will use the convention adopted in this circuit and refer to it as a CAT claim.

In accordance with § 2242(b) of FARRA, the Department of Justice ("DOJ") promulgated regulations setting forth the procedures by which individuals could seek relief under the CAT. See 64 Fed. Reg. 8478 (Feb. 19, 1999), codified at 8 C.F.R. §§ 208.16(c), .17, & .18(a) (2004). In § 208.18(a), the DOJ provided a definition of torture, incorporating "the definition of torture contained in Article 1 of [the CAT], subject to the reservations, understandings, declarations, and provisos contained in the [Senate] resolution of ratification of the Convention." Section 208.18(a)(1) provides a definition of torture which mirrors Article 1 of the CAT. In addition, the DOJ included six additional provisions, one of which is relevant to this case: "In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture." Id. § 208.18(a)(5) (emphasis added). If a petitioner is able to show that it is "more likely than not" that he or she will be tortured, deferral of removal is mandatory. Id. § 208.17(a).

IV.

This Circuit has previously addressed whether Haiti's policy of indefinitely imprisoning deportees who have been convicted in other countries violates the CAT. We review that history now.

Before we ever addressed this issue, in 2002, the BIA considered whether indefinite detention, inhuman prison conditions, and police mistreatment constitute torture under 8 C.F.R. § 208.18(a). Matter of J-E-, 23 I. & N. Dec. 291 (B.I.A. 2002). Relying on the understanding contained in the Senate Resolution, the BIA determined that in order to obtain relief under the CAT, a petitioner must show that the alleged torturous acts by the government will be "*specifically intended* to inflict severe physical or mental pain or suffering." Id. at 298. Considering Haiti's policy of indefinitely detaining deportees who have been convicted of crimes abroad, the BIA found that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." Id. at 300. Rather, the BIA concluded that the "Haitian prison conditions are the result of budgetary and management

9

problems as well as the country's severe economic difficulties." Id. at 301. Thus, the BIA concluded that the Haitian detention policy did not constitute torture for purposes of the CAT.[6]

Subsequently, in Zubeda v. Ashcroft, 333 F.3d 463 (3d Cir. 2003), our Court considered the CAT claim of an immigrant ordered removed to the Democratic Republic of the Congo ("DNC"). In the context of Zubeda's claim, we stated that the "intentionally inflicted" language in the regulations did not impose a "specific intent" requirement, but simply "exclude[d] severe pain or suffering that is the unintended consequence of an intentional act." Id. at 473. However, the decision in Zubeda did not turn on whether there is a specific intent requirement in the CAT; instead, the court remanded the case primarily for a clarification of the IJ's basis for determining that Zubeda would be detained upon her return to the DNC.

The following year, in Auguste, we considered the CAT claim of a Haitian citizen who had been imprisoned in the United States. In Auguste, the petitioner "claim[ed] that he w[ould] be indefinitely detained upon his arrival in Haiti in prisons that are notorious for their brutal and deplorable conditions." 395 F.3d at 128. We found the language from Zubeda discussed above to be dicta, and followed Matter of J-E-, holding that Auguste was unable to show the specific intent to torture required for relief under the CAT. We determined that the definition of torture under the CAT included a specific intent requirement as the court was obligated to "apply the standard clearly stated in the ratification

_____

[6] Matter of J-E-, 23 I. & N. Dec. 291, 297 (B.I.A. 2002) also announced a test for determining if an act constitutes torture. Citing to 8 C.F.R. § 208.18(a), the BIA announced that the act "must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions."

10

record." Id. at 140. We rejected Auguste's argument that the specific intent requirement could not be incorporated into United States law because it was inconsistent with the accepted international interpretation of the CAT. We clarified that "[a] treaty that is ratified . . . with a statement of understanding becomes effective in the domestic law subject to that understanding." Id. at 142 (quoting Restatement (Third) of the Foreign Relations Law of the United States § 314, cmt. d (2004)). Both the President and the Senate indicated their understanding that Article 1 of the CAT contains a specific intent requirement and that understanding has domestic legal effect.

Next, in Auguste we reviewed, with Chevron deference, the BIA's decision that specific intent should be interpreted with reference to its ordinary meaning in American criminal law and we determined that the BIA did not err in this determination. Citing to Carter v. United States, 530 U.S. 255, 269 (2000), we held that, in order to act with specific intent, an individual "must expressly intend to achieve the forbidden act." Id. at 145. More specifically, we found that "for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering." Id. at 145-46. Where the "severe pain and suffering" is merely a "foreseeable consequence" of the act, "the specific intent standard would not be satisfied." Id. at 146.

Thus, where Auguste complained of the conditions in the Haitian prison but not his particular vulnerability to them, we determined that the BIA did not err by concluding that the Haitian authorities would lack the requisite specific intent to inflict severe pain and suffering on Auguste, as the prison conditions were the result of "Haiti's economic and social ills," and did not derive from any intent to torture detainees. Id. at 153. Nevertheless, we cautioned that there is no "per se rule that brutal and deplorable prison conditions can never constitute torture. . . . [I]f there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture." Id. at 154.

11

In our most recent case to address whether the deportation of a Haitian ex-convict constitutes torture under the CAT, <u>Lavira</u>, we granted the petition of an HIV positive, "above-the-knee amputee with a lifelong political affiliation with exiled former President Jean-Bertrand Aristide." 478 F.3d at 159. <u>Lavira</u> interpreted <u>Auguste</u> as prohibiting relief "where the petitioner relied only on the general conditions of the Haitian detention facility." <u>Id.</u> at 167. In contrast, Lavira's condition "set him apart from the petitioner in <u>Matter of J-E-</u> [and] the general population incarcerated at the facility." <u>Id.</u> at 168. We held that Lavira had a valid claim because he presented evidence that showed that he would be targeted, such as being singled out by the guards because of his HIV-positive status. Noting that "demonstrating proof of intent is necessarily an inferential endeavor," we concluded that "<u>Auguste</u> demands no more." <u>Id.</u> at 171.

We also stated in <u>Lavira</u>, in dicta, that we could not "rule out" that specific intent could be proven through "evidence of willful blindness." <u>Id.</u> As discussed below, we now rule out that possibility.

After <u>Lavira</u> was decided, the Second Circuit decided <u>Pierre v. Gonzales</u>, 502 F.3d 109 (2d Cir. 2007). There, the government sought to remove Franck Pierre, a Haitian citizen, because of his aggravated felony and firearms convictions. Pierre sought relief under the CAT, presenting evidence regarding Haiti's prison conditions and detention policies, and his diabetes, which could lead to his death if he went without medication and a proper diet. The IJ denied him relief, concluding that there was no evidence that the Haitian authorities would detain him with the specific intent to inflict severe pain and that his relatives would be able to provide him with his medications while he was in detention. The BIA affirmed and Pierre sought review from the Second Circuit. The Second Circuit denied his petition, concluding that the CAT has a specific intent requirement and that Pierre failed to meet that standard. Calling <u>Lavira</u> a "wrinkle[]," the Second Circuit took issue with our language in <u>Lavira</u> that suggests that a government official's "willful blindness" or "deliberate indifference," which bear on the official's knowledge, could suffice to fulfill the specific

12

intent requirement, which requires an official to "intend the actual consequences of his conduct." Id. at 118. In the specific case before it, the Second Circuit found that the petitioner's diabetic condition did not "remove his case from the ambit of In re J-E-" and, accordingly, denied his petition. Id. at 111. In order to obtain relief based on individual circumstances, the petitioner would need to be able to show that "petitioners with certain histories, characteristics, or medical conditions are more likely to be targeted." Id. at 122.

V.

The specific issue on appeal concerns what degree of intent Pierre must establish in order to obtain relief under the CAT. To inform our analysis, we consider first the definition of torture in 8 C.F.R. § 208.18(a)(1). The regulation provides that an act is torture only if it is:

> intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Id. Here, Pierre will not be imprisoned 1) to obtain information or a confession from him, 2) to punish him for an act he committed or is suspected of having committed, 3) to intimidate or coerce him or someone else, or 4) for any discriminatory reason. Rather, Pierre will be imprisoned because the Haitian government has a blanket policy of imprisoning ex-convicts who are deported to Haiti in order to reduce crime. The lack of medical care and likely pain that Pierre will experience is an unfortunate but unintended consequence of the poor conditions in the Haitian prisons, which exist because of Haiti's extreme poverty. We find that this

13

unintended consequence is not the type of proscribed purpose contemplated by the CAT. To the extent Lavira suggests that the intentional infliction of severe pain need not be to accomplish one of the proscribed purposes, Lavira is overruled.

Given the ratification history of the CAT, we conclude that the CAT requires a showing of specific intent before the court can make a finding that a petitioner will be tortured. In this vein, we note that Pierre does not dispute that the CAT includes a specific intent requirement. Rather, Pierre argues that the specific intent requirement can be satisfied by a showing that the Haitian officials have knowledge that severe pain or suffering is the practically certain outcome of his imprisonment. We disagree that proof of knowledge on the part of government officials that severe pain or suffering will be the practically certain result of Pierre's detention satisfies the specific intent requirement in the CAT. Rather, we are persuaded by the discussion in Auguste that the specific intent requirement, included in the ratification history of the CAT, requires a petitioner to show that his prospective torturer will have the motive or purpose to cause him pain or suffering. As in Auguste, we hold that "for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act." Auguste, 395 F.3d at 145-46. Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result. Mere knowledge that a result is substantially certain to follow from one's actions is not sufficient to form the specific intent to torture. Knowledge that pain and suffering will be the certain outcome of conduct may be sufficient for a finding of general intent but it is not enough for a finding of specific intent.

As we discussed in Auguste, the BIA's decision in Matter of J-E- that specific intent means "the intent to accomplish the precise criminal act that one is later charged with" is entitled to Chevron deference. Id. at 144. Applying that deference, we concluded in Auguste that the BIA had not erred. Id. at 145. Fleshing out the definition of specific intent as it is used within American criminal law, Auguste relied on Carter v. United States,

14

530 U.S. at 269, in which the Supreme Court discussed the difference between specific intent and general intent. In Carter, the Supreme Court explained that an actor who knowingly commits an act but does not intend the illegal outcome of that act, can only be held liable for a general, not specific, intent crime.

In addition, the Supreme Court discussed the concept of specific intent in United States v. Bailey, 444 U.S. 394, 405 (1980), finding that "'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." This formulation of specific intent is found repeatedly in United States law. See, e.g., 31 U.S.C. § 3729(b) (knowledge is sufficient for liability under the False Claims Act, and "no proof of specific intent to defraud is required"); Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon, 515 U.S. 687, 697 n.9 (1995) (Congress's amendment to a criminal statute outlawing certain activities related to endangered species, in which "willfully" was replaced by "knowingly," was done in order "to make criminal violations of the act a general rather than a specific intent crime") (quoting H.R. Conf. Rep. No. 95-1804, p. 26 (1978)); Callahan v. A.E.V., Inc., 182 F.3d 237, 261 n.15 (3d Cir. 1999) (stating that "[a]lthough harm to the plaintiffs may have been a probable ultimate consequence of the defendants' actions, we do not think they specifically intended to cause such harm"); United States v. Blair, 54 F.3d 639, 642 (10th Cir. 1995) (holding that "a specific intent crime is one in which the defendant acts not only with knowledge of what he is doing, but does so with the objective of completing some unlawful act").

In our view, a petitioner cannot obtain relief under the CAT unless he can show that his prospective torturer will have the goal or purpose of inflicting severe pain or suffering.[7] Under this

_____

[7] Judge Rendell proposes a hypothetical in her concurrence which, she asserts, would not fit the majority's definition of specific intent. She posits that, under our definition, it would not be torture for a jailer to use electric shock tactics to solicit information where the "purpose in interrogating" is to obtain information, not to cause pain and suffering. However, people

15

standard, Pierre has failed to qualify for relief under the CAT because he has failed to show that Haitian officials will have the purpose of inflicting severe pain or suffering by placing him in detention upon his removal from the United States.

Finally, we reject Lavira's discussion of willful blindness. Willful blindness can be used to establish knowledge but it does not satisfy the specific intent requirement in the CAT. See United States v. Wasserson, 418 F.3d 225, 237 (3d Cir. 2005) (stating that evidence of willful blindness satisfies the mental state of knowledge). Moreover, to the extent that Lavira suggests that mere knowledge is sufficient for a showing of specific intent, we overrule that suggestion. In sum, because we have rejected the knowledge standard discussed in Lavira, and because Lavira contained no discussion of the illicit purpose requirement in the CAT, Lavira's CAT analysis is overruled.

VI.

In conclusion, we will deny Pierre's petition. As the courts in Matter of J-E- and Auguste found, there is no evidence that Haitian authorities imprison ex-convicts upon their deportation to Haiti in order to cause them severe pain or suffering. Rather, the conditions prevalent in the Haitian prison are due to "Haiti's economic and social ills." Auguste, 395 F.3d at 153. As Pierre is unable to show that the Haitian authorities specifically intend to cause him severe pain or suffering, he cannot fulfill the specific intent requirement of the CAT.[8]

---

commonly have dual purposes. In her hypothetical, the reason a jailer uses torture tactics is the jailer's belief that the pain caused will induce the prisoner to reveal information. Thus, under the hypothetical, the jailer would have a purpose of inflicting serious pain and suffering, satisfying the specific intent requirement, in addition to a purpose of obtaining information.

[8] Nothing herein prevents the government from granting discretionary relief to Pierre in the form of deferred action. Though we are bound to the specific intent requirement contained in the CAT, the government is not.

16

RENDELL, *Circuit Judge*, concurring, joined by McKEE and AMBRO, *Circuit Judges*.

The majority is correct that a finding of torture requires an examination of purpose. The examination occurs, however, not in connection with "specific intent," but, rather, in connection with the element of "illicit purpose." The majority conflates the two by deciding that specific intent to inflict severe pain and suffering only exists if the actor's purpose is to inflict pain. In doing so, it has obscured the meaning of specific intent and its proper contours as developed in the criminal law jurisprudence.

The definition of torture in CAT and its implementing regulations contains an intent element and a purpose element. *See* 8 C.F.R. § 208.18(a)(1) ("Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . ."). In *Matter of J-E-*, the BIA summarized the test under 8 C.F.R. § 208.18(a) as requiring that the act be:

> (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

23 I. & N. Dec. 291, 297 (B.I.A. 2002). The BIA's decision in *Matter of J-E-* also introduced the concept of using the criminal law to interpret the term "specifically intend" in CAT's implementing regulations. *Id.* at 301 (citing the definition of specific intent in Black's Law Dictionary).

17

Our Court subsequently looked to the criminal law for guidance in both *Auguste v. Ridge*, 395 F.3d 123 (3d Cir. 2005), and *Lavira v. Attorney General*, 478 F.3d 158 (3d Cir. 2007). In *Auguste*, we concluded that the BIA had correctly defined the specific intent requirement by reference to domestic criminal law as "the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness." 395 F.3d at 145. We did not require that a would-be torturer have the purpose to inflict severe pain and suffering, but, rather, simply concluded that mere recklessness was insufficient to satisfy CAT's "specific intent" requirement. *Id*. at 146. In *Lavira*, we similarly resorted to criminal law for guidance, and concluded that the specific intent requirement was satisfied by evidence that, given the petitioner's "obvious vulnerability and its nearly inevitable consequences" and the expert report submitted regarding the treatment of HIV/AIDS patients, he would be singled out and targeted by prison guards. 478 F.3d at 169-71. By contrast to *Auguste*, the petitioner in *Lavira* alleged that "[s]evere pain is not 'a' possible consequence that 'may result from placing Lavira in the facility, it is the only possible consequence given what Haitian officials know about Lavira and about their own facility." *Id*. at 170. We held that he, therefore, had properly demonstrated specific intent, in the form of the prison official's knowledge that severe pain and suffering would certainly result. Neither case hinted at a need for a purpose to inflict pain, nor have specific intent crimes historically included purpose as an element.[9] Today, disregarding the weight of criminal authority, the majority adds this requirement.

_____

[9] At common law, specific intent crimes included burglary, false pretenses, embezzlement, attempt, solicitation, and conspiracy. *See* Black's Law Dictionary 825 (8th ed. 2004). They required intent in the form of knowledge or desire that the result will occur–not "purpose." General intent, according to Black's Law Dictionary, requires "the intent to perform an act even though the actor does *not* desire the consequences that result." *Id*. It "usually takes the form of recklessness." *Id*. It is readily agreed that general intent crimes at common law, such as manslaughter, require no more than a reckless state of mind.

18

The majority equates "intentionally inflicted" under CAT, which requires specific intent, to "pain for pain's sake." This goes beyond the meaning of intentional infliction under *J-E-*. The specific intent aspect does not speak to, or require a finding as to, the purpose; the illicit purpose element does. As discussed below, "pain for pain's sake" would be an illicit purpose.

Specific intent, as it has been developed through the criminal caselaw and treatises, is no more than intent to do the prohibited act with *knowledge or desire that it will cause a certain result*. *Tison v. Arizona*, 481 U.S. 137, 150 (1987); *United States v. Gypsum Co.*, 438 U.S. 422, 445 (1978); 1 Wayne R. LaFave, Substantive Criminal Law § 5.2(e), at 354 (2d ed. 2003); *see also Carter v. United States*, 530 U.S. 255, 268 (2000) (explaining that general intent, as opposed to specific intent, requires "that the defendant possessed knowledge [only] with respect to the actus reus of the crime").

The source of the majority's requirement of "purposeful pain" is, therefore, somewhat curious. It is regrettable that an errant sentence in a different context in *United States v. Bailey*, suggesting that "[i]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent," veered from the historical meaning. 444 U.S. 394, 403 (1980). The sentence is at best incomplete and misleading and certainly cannot be relied upon to establish that "specific intent" must mean "purpose." If, as the government urges, *Bailey* does establish that specific intent can only be proven where an individual acted with the purpose of causing a particular consequence, it would also mean that, since 1980, all prosecutions for specific intent crimes either proved the defendant's purpose as to consequences (and did not rely on knowledge of the certainty of consequences) or resulted in acquittals based on *Bailey*. We know this is not the case. Our own jury instructions continue to define "intentionally"–the term used in the CAT regulations–and "with intent" to mean: "Either that (1) it was [defendant's] conscious desire or purpose . . . to cause a certain result, or that (2) [defendant] knew that (he)(she) . . . would be practically certain to cause that result." Third Circuit Jury Instructions § 5.03 (Sept. 2006). This is the proper definition of specific intent. Furthermore, *Bailey* purported only to

19

summarize the state of the law, not to overrule precedent interpreting the common law term. Indeed, the term "loosely" used by the *Bailey* Court indicates that specific intent, in fact, has meanings other than purpose. As a common law term, it retains its traditional meaning–that urged by petitioner.

The issue before us has been the subject of recent commentary that is timely and persuasive. In an August 1, 2002 memo to the White House Counsel, Jay Bybee, Assistant Attorney General, set forth an interpretation of "specific intent" that is similar to that espoused by the majority. There, he stated that "knowledge alone that a particular result is certain to occur does not constitute specific intent." *Id*. at 3-4. It concluded that "even if a defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite specific intent even though the defendant did not act in good faith." *Id*. at 4. This is the interpretation that was relied upon in defense of the abuse at Abu Ghraib and the torture of prisoners during interrogations at facilities in Iraq and Afghanistan.

However, this interpretation of "specific intent" has since been soundly repudiated by the very office that promulgated it. *See* Justice Department Dec. 30, 2004 Memo on U.S. Torture Policy for Deputy Attorney General James B. Comey ("2004 Memo"). The 2004 Memo explained that:

> In the August 2002 Memorandum, this Office concluded that the specific intent element of the statute required that infliction of severe pain or suffering be the defendant's "precise objective" and that it was not enough that the defendant act with knowledge that such pain "was reasonably likely to result from his actions" (or even that that result "is certain to occur"). *Id*. at 3-4. We do not reiterate that test here.

*Id*. at n.27.

20

The Memo then went on to state:

> It is well recognized that the term "specific intent" is ambiguous and that the courts do not use it consistently. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2(e), at 355 & n.79 (2d ed. 2003). "Specific intent" is most commonly understood, however, "to designate a special mental element which is required above and beyond any mental state required with respect to the actus reus of the crime." *Id*. at 354; *see also Carter v. United States*, 530 U.S. 255, 268 (2000) (explaining that general intent, as opposed to specific intent, requires "that the defendant possessed knowledge [only] with respect to the actus reus of the crime"). As one respected treatise explains:
>
> > With crimes which require that the defendant intentionally cause a specific result, what is meant by an "intention" to cause that result? Although the theorists have not always been in agreement . . . , the traditional view is that a person who acts . . . intends a result of his act . . . under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that that result is practically certain to follow from his conduct, whatever his desire may be as to

that result.

1 LaFave, *Substantive Criminal Law*, § 5.2(a), at 341 (footnote omitted).

As noted, the cases are inconsistent. Some suggest that only a conscious desire to produce the proscribed result constitutes specific intent; others suggest that even reasonable foreseeability suffices. In *United States v. Bailey*, 444 U.S. 394 (1980), for example, the Court suggested that, at least "[i]n a general sense," *id*. at 405, "specific intent" requires that one consciously desire the result. *Id*. at 403-05. The Court compared the common law's mens rea concepts of specific intent and general intent to the Model Penal Code's mens rea concepts of acting purposefully and acting knowingly. *Id*. at 404-05. "[A] person who causes a particular result is said to act purposefully," wrote the Court, "if 'he consciously desires that result, whatever the likelihood of that result happening from his conduct.'" *Id*. at 404 (internal quotation marks omitted). A person "is said to act knowingly," in contrast, "if he is aware 'that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.'" *Id*. (internal quotation marks omitted). The Court then stated: "In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." *Id*. at 405.

22

In contrast, cases such as *United States v. Neiswender*, 590 F.2d 1269 (4th Cir. 1979), suggest that to prove specific intent it is enough that the defendant simply have "knowledge or notice" that his act "would have likely resulted in" the proscribed outcome. *Id*. at 1273. "Notice," the court held, "is provided by the reasonable foreseeability of the natural and probable consequences of one's acts." *Id*.

We do not believe it is useful to try to define the precise meaning of "specific intent" in section 2340. In light of the President's directive that the United States not engage in torture, it would not be appropriate to rely on parsing the specific intent element of the statute to approve as lawful conduct that might otherwise amount to torture. Some observations, however, are appropriate. **It is clear that the specific intent element of section 2340 would be met if a defendant performed an act and "consciously desire[d]" that act to inflict severe physical or mental pain or suffering. 1 LaFave, *Substantive Criminal Law* § 5.2(a), at 341. Conversely, if an individual acted in good faith, and only after reasonable investigation establishing that his conduct would not inflict severe physical or mental pain or suffering, it appears unlikely that he would have the specific intent necessary to violate sections 2340-2340A. Such an individual could be said neither consciously to desire the proscribed result, *see, e.g., Bailey*, 444 U.S. at 405,**

23

**nor to have "knowledge or notice" that his act "would likely have resulted in" the proscribed outcome,** *Neiswender*, **590 F.2d at 1273.**

Two final points on the issue of specific intent: First, **specific intent must be distinguished from motive.** There is no exception under the statute permitting torture to be used for a "good reason." **Thus, a defendant's motive (to protect national security, for example) is not relevant to the question whether he has acted with the requisite specific intent under the statute**. *See Cheek v. United States*, 498 U.S. 192, 200-01 (1991). Second, specific intent to take a given action can be found even if the defendant will take the action only conditionally. *Cf., e.g., Holloway v. United States*, 526 U.S. 1, 11 (1999) ("[A] defendant may not negate a proscribed intent by requiring the victim to comply with a condition the defendant has no right to impose."). *See also id*. at 10-11 & nn. 9-12; Model Penal Code § 2.02(6). Thus, for example, the fact that a victim might have avoided being tortured by cooperating with the perpetrator would not make permissible actions otherwise constituting torture under the statute. Presumably that has frequently been the case with torture, but that fact does not make the practice of torture any less abhorrent or unlawful.

*Id*. at 16-17 (emphases added). Thus, the 2004 memorandum both affirmatively stated that the specific intent element is *not* tied to a purpose or 'precise objective' to inflict severe pain and suffering, and suggested that knowledge of 'reasonably likely' results could

24

come within the definition of specific intent.

Consistent with this, the specific intent requirement in CAT's implementing regulations excludes "unanticipated" or "unintended" severity of pain and suffering. 8 C.F.R. § 208.18(a)(5). Again, I cannot emphasize enough, the mental element is *knowledge or desire that pain and suffering will result*. This is different from the underlying purpose of the act. The distinction is subtle, but important. We should hold that if *severe pain and suffering is desired or known to result* from the actor's conduct, the specific intent element is fulfilled.[10] Only then does the inquiry turn to the "purpose" element under CAT, as set forth in *J-E-*.

Under CAT, "illicit purposes" include, but are not limited to, "such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind"; exempted from CAT is "pain or suffering arising only from, inherent in or incidental to lawful sanctions," defined to "include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty," but to exclude

---

[10] To the extent that the majority fears that such a holding would open the floodgates to CAT petitioners from places such as Haiti where the petitioner will likely be subjected to deplorable conditions, there remains an evidentiary burden of showing that would-be torturers in such places know of or desire the resulting infliction of severe pain and suffering. Furthermore, CAT's other requirements must also be met, such that a deportation to a country with sub-par medical treatment will not constitute torture because, among other things, there needs to be official action in a custodial situation that subjects the petitioner to inevitable pain and suffering. *See* 8 C.F.R. § 208.18(a)(6) (requiring that an act of torture be performed by or at the acquiescence of a public official and directed against a victim in the torturer's custody or physical control).

25

those "sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." 8 C.F.R. §§ 208.18(a)(1) & (3). This list sets forth examples and is not exhaustive. (As a matter of statutory interpretation, the term "such . . . as" does not designate a closed list). It is this "purpose" element that will require a finding as to the actor's motive. Pain for pain's sake would clearly be an illicit purpose–but is just one of a number of possible proscribed motives. Each element–specific intent and purpose, respectively–is analytically separate.

By conflating purpose with specific intent, the majority has excluded from the definition of torture those acts that we all would agree constitute torture. Imagine the following situation:

> A military official in Haiti desires information from a detained, suspected terrorist. His purpose in interrogating the detainee is to solicit information. In the course of the interrogation, he begins to use coercive tactics. The official's only purpose and conscious desire is to receive information. He is indifferent as to whether his tactics (electric shock) cause severe pain and suffering; indeed, he had hoped that the detainee would give him information without the infliction of pain and suffering. The shock treatment is administered and does cause severe pain and suffering.

Is this not torture? Under the majority's interpretation, it is not. Although obtaining information is an illicit purpose satisfying that prong of CAT's implementing regulations, the official's conduct will not meet the standard the majority has set for the specific intent requirement; his purpose is to obtain information, not to inflict severe pain and suffering. By contrast, an interpretation that adopts the criminal law definition of specific intent and encompasses knowledge or desire that severe pain and suffering will occur includes the above hypothetical in the definition of

torture under CAT.

Although I disagree with majority's interpretation of specific intent and its resulting conflation of the specific intent and illicit purpose elements under the CAT statute, I concur in the result. In this case, the petitioner simply failed to adduce adequate evidence before the IJ from which we can conclude that there will be intentional infliction of pain–i.e., with knowledge or desire on the part of the prison officials. In this way, the present case is distinguishable from *Lavira*. Here, the allegations made before the IJ were not substantiated with proof of either intent or proscribed purpose and were, at most, akin to a generalized challenge to prison conditions rejected in *Auguste*. I therefore concur in the result reached by the majority, but disagree with its conclusion that the "intentional infliction" element of torture requires a finding that the actor's purpose is to cause severe pain and suffering.[11]

---

[11] I also agree that our discussion of willful blindness in *Lavira* was dicta, referring as we did only to the possibility that it would suffice to fulfill the "intent" prong. I conclude that while "willful blindness" may permit a jury to conclude that someone was aware of, for example, the illegal nature of an enterprise, its application to satisfy the scienter requirement for torture is a different matter which we need not now explore. I disagree with the majority's reason for rejecting "willful blindness" as a way to prove the specific intent element in the torture context, however, because it is based on its misconception that it is "purpose," not knowledge of a certain result, that must be demonstrated.