OPINION
BARRY, Circuit Judge.
Ezeadigo Chinedu Oduche-Nwakaihe (“Oduche”) petitions for review of (1) the June 4, 2008 order of the Board of Immigration Appeals (the “BIA”), vacating the Immigration Judge’s (“IJ”) order granting deferral of removal pursuant to the Convention Against Torture (“CAT”), and (2) the BIA’s October 16, 2008 order denying his motion to reopen his removal proceedings to permit him to submit evidence of the State Department’s 2007 Country Reports for Nigeria (“2007 Country Reports”). We will deny the petitions for review.
BACKGROUND[1]
Oduche, a native of Nigeria, was admitted to the United States on March 27, 2003, with the status of a lawful permanent resident alien. On June 15, 2007, he pled guilty to rape in the fourth degree in Kent County, Delaware.[2] On September 11, 2007, the U.S. Department of Homeland Security commenced removal proceedings against him by filing a Notice to Appear. At a hearing on December 17, 2007, the IJ found that Oduche’s “conviction for rape in the fourth in Delaware is rape [sic] offense requiring that you lose your permanent residency in the United States and requires your deportation.” (CAR at 173.) On January 7, 2008, Oduche filed an application for asylum, withholding of removal, and protection under CAT.[3] (Id. at 262, 266.)
On January 30, 2008, the IJ ordered that Oduche be removed to Nigeria;[4] however, although Oduche’s criminal conviction for rape in the fourth degree rendered him ineligible for asylum and withholding of removal, the IJ granted him deferral of removal under Article III of CAT. He explained that Oduche was credible and that his fear of religious persecution was credible, but “because respondent is statutorily precluded from establishing past persecution ... because of his aggravated felony conviction, the Court is not permitted to consider that aspect of the claim.” {Id. at 147.) Thus, the “primary thrust of respondent’s claim ... would be his immediate arrest and detention and jailing in Nigeria upon his arrival as a criminal deportee.” {Id.) The IJ made “an administrative finding of fact” that this practice, carried out pursuant to a directive known as “Decree 33,” was still in effect. (Id. at 150.) He explained that experts in other cases relating to Nigeria had attested to the force of Decree 33 and, as a result, took “administrative notice” that Oduche would be detained upon returning to Nigeria. {Id. at 148,153.)
The IJ then turned to Oduehe’s argument that, once in prison, he would be tortured. Acknowledging that substand *900 ard prison conditions do not, generally, constitute torture within the meaning of 8 C.F.R. § 1208.18(a) and that immigration courts should avoid “stringing together a series of suppositions” to show that torture is the likely result, the IJ nonetheless concluded that the relevant Country Reports for Nigeria revealed a “high incidence rate of impunity of police officers using excessive and deadly force on persons and killing persons in custody.” (Id. at 149, 151.) Thus, the IJ concluded that it was more likely than not that, once he was inevitably detained, Oduche would be tortured, and deferred his removal under CAT.[5]
The government appealed. On June 4, 2008, the BIA vacated the IJ’s decision granting deferral of removal. The BIA did not agree that Oduche would be detained under Decree 33, and rejected the notion that “the continued application or continued enforcement of Decree 33 in Nigeria is a matter that is subject to administrative notice.” (Id. at 2-3.) Oduche had urged the BIA to take notice of the recent 2007 Country Reports, detailing the horrors associated with the Nigerian prison system, but the BIA concluded that despite the “evidence of harsh and life-threatening prison conditions in Nigeria,” Oduche’s case was based on speculation rather than “adequate evidence” that he “more likely than not ” would be tortured upon his return. (Id. at 3.)
On August 29, 2008, Oduche filed a motion to reopen with the BIA, arguing that the BIA had failed to take notice of the 2007 Country Reports, which he claimed would have validated his fears of torture within prison.[6] On October 16, 2008, the BIA denied the motion to reopen, finding that the 2007 Country Reports did not resolve the “chain of assumptions that were previously determined to have been made,” including whether he would even be detained in Nigeria, much less be tortured during that detention. (Pet.Br., Ex. B.) It also found that Oduche failed to establish “that the result in this case would be likely to change if the proceedings were reopened.” (Id.)
Pursuant to our order of October 24, 2008, Oduche’s two petitions have been consolidated. In his first petition, now his first claim, Oduche seeks review of the BIA’s June 4, 2008 order directing that he be removed to Nigeria and vacating the IJ’s deferral of removal. His second claim seeks review of the BIA’s October 16, 2008 order denying his motion to reopen the proceedings to permit him to place into evidence the 2007 Country Reports. As that order makes clear, however, the BIA had considered the contentions of the 2007 Reports. (Pet.Br., Exh. B.)
JURISDICTION
Although 8 U.S.C. § 1252(a)(2)(C) limits the federal courts’ jurisdiction to review final decisions ordering the removal of aliens who commit aggravated felonies, § 1252(a)(2)(D) makes clear that courts retain jurisdiction to review “constitutional claims or questions of law raised upon a petition for review....” See Mudric v. Att’y Gen., 469 F.3d 94, 97 (3d Cir.2006); Singh v. Gonzales, 432 F.3d 533, 537 (3d Cir.2006). Oduche explains the various issues at hand, which include whether the IJ erred in taking administrative notice of *901 Decree 33, whether the BIA misapplied the CAT standard, whether the BIA adequately explained its decision to vacate the IJ’s deferral of removal, and whether the BIA impermissibly engaged in de novo fact finding. The thrust of the government’s argument is that because these claims — in the government’s view — are “without merit ... they do not present meritorious legal or constitutional claims” and, thus, cannot be reviewed. (Gov’t Br. at 27.) We are satisfied that Oduche has raised at least some questions of law, and that we have jurisdiction to proceed.[7]
DISCUSSION
Although Oduche raises various issues in this appeal, he ultimately seeks deferral of removal on the ground that he rvill more likely than not be tortured once in prison in Nigeria. We will assume arguendo that Oduche would be imprisoned upon his return to Nigeria and focus on his torture claim.
We review the BIA’s decisions to vacate the IJ’s deferral ruling and refusal to reopen the case under the substantial evidence standard and will uphold the BIA’s determinations “unless the evidence not only supports a contrary conclusion, but compels it.” Sheriff v. Att’y Gen., 587 F.3d 584, 588-89 (3d Cir.2009) (quoting Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir.2001)). To the extent we consider questions of law and the application of law to facts, our review is de novo. 8 U.S.C. § 1252(a)(2)(D); Yusupov v. Att’y Gen., 518 F.3d 185, 197 (3d Cir.2008).
In Pierre v. Attorney General of the United States, we set out the purposes of CAT and the Department of Justice’s role in “promulgat[ing] regulations setting forth the procedures by which individuals could seek relief under the CAT.” 528 F.3d 180, 186 (3d Cir.2008) (en banc). Those regulations make clear that deferral of removal is mandatory where the petitioner demonstrates that it is more likely than not, 8 C.F.R. § 208.17(a) (emphasis added), that he will be subjected to an act “specifically intended to inflict severe physical or mental pain or suffering,” 8 C.F.R. § 208.18(a)(5). As we explained:
[F]or an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act. Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result.
528 F.3d at 189 (internal citation and quotations omitted).
We have applied this standard in the context of detention facilities on numerous occasions in the past. In Auguste v. Ridge, for example, where the petitioner complained of the prison conditions in Haiti, we found that the BIA did not err in its finding that Haitian officials lacked the specific intent to torture him because the deplorable conditions resulted from “Haiti’s economic and social ills” rather than an “intent to inflict severe pain and suffering on detainees.” 395 F.3d 123, 153 (3d Cir. 2005). In Pierre, we affirmed the BIA’s denial of the petition for CAT relief where petitioner claimed that his medical prob *902 lems would be neglected by prison officials, resulting in his death. 528 F.3d at 182-83. We held that the petitioner was unable to show that “by imprisoning him, the Haitian authorities have the specific intent to torture him.” Id. at 183. In In Re J-E-, the petitioner testified that upon his return to Haiti, he would be jailed and tortured. In support of his claim, he submitted Country Reports explaining that police mistreatment by means of beatings with sticks and belts, burning with cigarettes, choking, and severe boxing of the ears, was “pervasive in all parts of the country.” 23 I. & N. Dec. 291, 301 (2002). Finding that the record contained only “isolated instances of mistreatment ... that rise to the level of torture,” the BIA concluded that the evidence was “insufficient to establish that it is more likely than not” that the petitioner would be tortured if removed to Haiti. Id. at 301-03. In particular, the BIA held that “[slpecific grounds must exist that indicate the individual would be personally at risk.” Id. at 303.
Oduche ai’gues that there is evidence of routine, widespread prisoner abuse in Nigeria and, thus, that his case is different from Auguste and Pierre, where the harm inflicted on the imprisoned was unintentional and' the result of economic woes. He cites the 2007 Country Reports, which state that officers regularly beat detainees and convicted prisoners. The Country Reports also note that when a United Nations Special Rapporteur on Torture was invited by the Nigerian government “to assess the situation ..., the rapporteur reported that torture was endemic in law enforcement operations, including police custody ... [and that] the methods of torture included flogging with whips; beating with batons and machetes; shooting a suspect in the foot ... suspension from the ceiling; and denying food, water, and medical treatment.” (Pet.Br., Ex. D.)
The acts cited in the 2007 Country Reports are certainly abhorrent. As evidence that he will more likely than not fall victim to these abuses, however, Oduche merely points to the rapporteur’s judgment that they are “endemic” to Nigerian prisons and findings that they “had become routine.” (Pet. 08-2736 Br. at 29.) In its order vacating the deferral of removal, the BIA found that Oduche’s case was “based on a chain of assumptions and a fear of what might happen, rather than adequate evidence that meets his burden of demonstrating that it is more likely than not that he will be subjected to torture .... ” (CAR at 3.) In its order denying Oduche’s motion to reopen, the BIA explained that had it considered the 2007 Country Reports, but that the Reports did not even “address the likelihood that the respondent would be arrested and detained upon his arrival in Nigeria.” (Pet. Br., Ex. B.) The BIA added that “such report does not sufficiently meet the respondent’s burden of demonstrating that it is more likely than not that he will be subjected to torture ... if he is returned to Nigeria.” (Id.)
The IJ conceded that this was a close case, finding, on the one hand, that “we have no evidence of how respondent would be treated ... once he is detained,” but ruling, on the other hand, that Oduche met his burden because of the “high incidence rate of impunity” of officials toward those in custody. (CAR at 149, 151-53.) However, a petitioner must show that the prospective torturer “will have the purpose of inflicting severe pain or suffering by placing him in detention upon his removal from the United States.” Pierre, 528 F.3d at 190. In light of the lack of evidence in this x’ecord addressing whether it is more likely than not that Oduche would fall victim to intentionally inflicted torture while incarcerated in a Nigerian prison, we can *903 not say that we are compelled to reach a conclusion contrary to that reached by the BIA.
CONCLUSION
The petitions for review will be denied.

. The record citations in this order refer to the Certified Administrative Record ("CAR").

. Oduche was having a sexual relationship with his eighteen-year-old girlfriend when, at some point, he became sexually involved with her mother as well. This triangle was unsustainable, and the fourth degree rape charge for penetration without consent resulted from the mother's allegations about Oduche’s allegedly nonconsensual activities with her daughter. As the government's brief details, this was not Oduche’s first encounter with Delaware's criminal justice system.

. He cited his adherence to Christian principles, which would result in his suffering harm in Nigeria; his political opinions; and his membership in a particular social group. (CAR at 266.)

. Oduche was subject to removal pursuant to 8 U.S.C. § 1227(a)(2)(A).

. See 8 C.F.R. § 1208.17 ("An alien who: has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.”).

. The 2007 Country Reports were not issued until March 6, 2008.

. For example, with respect to Oduche's contention that the BIA impermissibly applied the CAT standard for deferral, which the government characterizes as “at odds with the Attorney General's framework for analyzing CAT claims,” Gov't Br. at 27, we have jurisdiction to the extent that this issue "present[s] questions of law, or of the application of law to undisputed fact.” Singh, 432 F.3d at 537-38; Kamara v. Att’y Gen., 420 F.3d 202, 211 (3d Cir.2005).