PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 08-4790

———————

JINYU KANG,
                    Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                    Respondent

———————

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A-99-939-158)
Immigration Judge:  Honorable Walter A. Durling

———————

Argued May 26, 2010

Before:  McKEE, Chief Judge, RENDELL and
GARTH, Circuit Judges.

(Filed: July 8, 2010)

———————

Man C. Yam, Esq.     **[ARGUED]**
Law Offices of Beranrd & Yam
401 Broadway, Suite 1708
New York, NY 10013
 *Counsel for Petitioner*


John W. Inkeles, Esq.     **[ARGUED]**
U.S. Department of Justice
Office of Immigration Litigation
450 5th Street, N.W.
Washington, DC 20001
   *Counsel for Respondent*

---

OPINION OF THE COURT

---


RENDELL, <u>Circuit Judge</u>.

In October 2003, Jinyu Kang, a Korean citizen of China, was named in a Chinese arrest warrant with two other individuals, Zheyun Jin and Baoyu Jin, all three of whom were members of a group called the "Human Rights Organization." They were being sought by the Chinese police for providing food and shelter to North Korean refugees who had illegally entered China on their way to South Korea.

After learning that there was a warrant for her arrest, Kang fled China and illegally entered the United States in

2

January 2004. She was later arrested by the Philadelphia police for solicitation, but those charges were withdrawn. Kang conceded removability under 8 U.S.C. § 1182(a)(6)(A)(i), but applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3) on grounds of future persecution, and withholding of removal under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied Kang's petition for asylum and her application for withholding of removal based on future persecution, but granted her relief under CAT. The BIA affirmed except as to the CAT claim and therefore ordered Kang removed. Kang has filed a petition for review, which we will grant in part.

Kang is not contesting the IJ's or the BIA's decisions on her asylum claim, but she contends that the IJ and the BIA erred in denying her withholding of removal based on future persecution, and that the BIA erred in reversing the IJ's grant of relief under CAT. We will grant Kang's petition for review and vacate and reverse the BIA's decision on her CAT claim because the BIA's determination is not supported by substantial evidence. Instead, the record compels the contrary conclusion, namely, that it is more likely than not that Kang will be tortured if returned to China.

I. Proceedings Before the Immigration Judge

The IJ held hearings on Kang's claims on April 24, 2008, and May 21, 2008, and issued a written decision on June 27, 2008. In his written decision, the IJ held that Kang's asylum claim was time-barred as it was not filed within 1 year after the date of her arrival in the United States. 8 U.S.C. §

3

1158(a)(2)(B).  On appeal, Kang does not challenge this ruling. The IJ also denied withholding of removal on the ground of future persecution under § 1231(b)(3).  We need not address Kang's claim for withholding of removal based on future persecution because we grant her relief under CAT.

Kang presented extensive evidence in support of her application for withholding of removal under CAT.  She submitted affidavits from Zheyun Jin and Baoyu Jin, the two other individuals named with her in the arrest warrant.  Both Zheyun Jin and Baoyu Jin recounted in detail that they were subjected to abuse by Chinese officials while being interrogated about the locations of other people involved in their organization.

Zheyun Jin stated that, while interrogating him, authorities beat him with police clubs, put bags over his head to obstruct his breathing, poured cold water over him, pulled his hair, forced him to kneel for hours, whipped the soles of his feet, slapped him until his face was swollen and "blood [was] streaming down," deprived him of sleep, and tied him "to the railing with [his] hands at the back and [his] feet hanging in the air," to the point that his arms were "almost broken."  App. 614.

Baoyu Jin stated that as part of her interrogation, Chinese authorities deprived her of sleep to the point that her vision deteriorated, and they obstructed her breathing by putting bags over her head, causing her to faint several times.  Baoyu Jin also stated:

> They hung me on the awning, with my hands on the back, and shot strong light beam directly into my eyes. I could not even open my eyes, and my tears coming down. Such painful experience was beyond words. After I was hung up, the tip of my toe could hardly touch the ground. When I felt tired, and wished to stand on the heel of my feet, my wrists felt great pain. Now both of my wrists are swelling and can not exert strength. The police also cuffed both my hands to a piece of heating unit, and use the electric club to touch the heating piece. The electric current flew through my body, and I felt very painful. I still did not say anything.

App. 618.

At the IJ's hearing, Kang also offered the testimony of Steven Kim, a United States citizen detained by the Chinese authorities for 48 months for helping North Korean refugees enter China illegally. Kim testified that he was spared from being beaten while in custody only because he was an American and the Chinese officials were afraid that if they mistreated him, he would tell the American consular representative during the representative's monthly visits. However, Kim testified that prisoners who were detained for aiding North Koreans were handcuffed to iron bars and forced to stand for 48 hours at a time. Kim also testified that harsh treatment was meted out when prisoners gave unsatisfactory answers to questions about the effort to assist the North Korean refugees, including questions about their personal conduct and about the identities

5

and conduct of others involved. Kim stated that he had spoken with a prisoner who, after refusing to answer these questions, had been beaten, restrained, shocked with electricity, and deprived of sleep for 48 hours at a time. Kim saw the scars on that prisoner's chest and wrist resulting from these beatings. Along with his testimony, Kang also submitted an affidavit from Kim reciting several of these allegations.

During her hearing before the IJ, Kang testified that she believed she would be interrogated and tortured if she returned to China because she had been a member of the Human Rights Organization, left China without permission, and had applied for asylum in the United States. She stated that members of her organization who were detained by the Chinese authorities reported that they had been beaten and tortured. Kang also testified that the authorities interrogated her son to learn her whereabouts, and that during this interrogation, he, too, was beaten, kicked, deprived of sleep for several days, and detained in solitary confinement. These allegations were corroborated by the contents of an affidavit submitted by Kang's son, wherein he stated that after Kang fled the country, Chinese authorities deprived him of sleep, slapped him on the face, kicked him in the stomach, and pulled his hair when he refused to answer their questions about where his mother had gone.

At the hearing, Kang also introduced a 2007 Country Report on China issued by the U.S. State Department, which reported that "there continued to be frequent reports that police and other elements of the security apparatus employed widespread torture and degrading treatment when dealing with some detainees and prisoners." App. 506. Although torture is

6

against the law in China, "the Supreme People's Procuratorate (SPP) Deputy Secretary Wang Zhenchuan acknowledged that illegal interrogation by 'atrocious torture' existed in local judicial practice throughout China." *Id.* Prisoners reported being tortured with "electric shocks, beatings, shackles," "suspension from the ceiling by [one's] arms," and being "shackled and forced to sit in extreme positions for extended periods of time." App. 506-07. One prisoner recounted being chained to an iron bed for days and another stated that he was tied to a "tiger bench" for four hours. App. 506. When using a "tiger bench," the victim is seated on a bench with "legs tied stretched out straight on the bench and hands tied behind a vertical back support. Bricks or other hard objects are then pushed under the victim's legs or feet, causing the legs to bend upwards, sometimes until they break." *Id.* While the report stated that torture was "on a decline--particularly in urban areas," it still noted that torture "remained widespread, and that procedural and substantive measures were inadequate to prevent torture." App. 507. Despite Chinese courts "issu[ing] directives to eliminate interrogation through torture" in 2006, there was an 8.3% increase in cases of "dereliction of duty and infringement of rights by officials" from 2006 to 2007. *Id.*

The IJ granted withholding of removal under CAT, concluding that "[t]he overall record evidence more than suggests that [Kang's] fears of likely prospective torture through the intentional infliction of severe pain or suffering while in the Chinese government's custody or physical control has merit." App. 325. Although the IJ specifically cited only Kim's testimony and the Country Report, it is clear that he considered

7

the record as a whole before reaching this conclusion.[1]

## II. The BIA's Ruling

The Government appealed the IJ's grant of withholding of removal under CAT, and Kang cross-appealed the denial of asylum and withholding of removal under § 1231. The BIA affirmed the IJ's denial of asylum and withholding of removal under § 1231, and reversed the IJ's grant of withholding of removal under CAT.

With respect to withholding of removal under CAT, the BIA concluded that the "IJ erred in determining that it is more likely than not that [Kang] would be tortured if returned to China." App. 24. The BIA determined that the Country Report was not persuasive because, while it stated that there are frequent reports of torture in China, it "does not indicate that those imprisoned for smuggling were specifically at risk or routinely subjected to torture." *Id*. The BIA described Kim's

---

[1] The IJ noted a "disconnect between [Kang's] testimony and the information in the arrest warrant" (specifically, an inconsistency between the date the arrest warrant was issued and the date Kang testified that she learned of the arrest warrant), but, despite noting that there was "confusion" surrounding the arrest warrant, he did not make an adverse credibility finding. App. 321. "We have several times affirmed the rule that where an IJ or the BIA fails to make an explicit credibility finding, we will proceed as if the applicant's testimony were credible." *Toure v. Att'y Gen.*, 443 F.3d 310, 326 (3d Cir. 2006).

8

testimony as stating "that some people were beaten by other inmates and guards, chained for prolonged periods, and subjected to severe conditions and interrogations," and decided that "[a]lthough conditions in Chinese prisons may be harsh, and incidents of torture may occur, we find that the respondent has failed to demonstrate that it is more likely than not that she would be subjected to treatment specifically intended to torture her while imprisoned." *Id.*

The BIA also stated that "[t]he record does not establish that the Chinese authorities use torture as a matter of policy, and the Country Report indicates that the incidents of torture are on the decline and that the government is taking steps to eliminate interrogation through torture." App. 25. The BIA thus concluded that "the respondent has failed to establish that the severe instances of mistreatment found in the record are so pervasive as to establish that a person detained in a Chinese prison will be more likely than not be subjected to torture, as opposed to other acts of punishment or treatment, which do not amount to torture." *Id.*

In its decision, the BIA specifically referred only to Kim's testimony and the Country Report. The BIA completely ignored the rest of the record, including the affidavits of Zheyun Jin, Baoyu Jin, and Kang's son.

III. Jurisdiction and Standard of Review

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We exercise jurisdiction under 8 U.S.C. § 1252. Because the

9

BIA did not adopt or defer to the IJ's opinion regarding Kang's CAT claim, we review only the BIA's decision. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001). We review the BIA's legal determinations *de novo*, "subject to the principles of [*Chevron*] deference." *Pierre v. Att'y Gen.*, 528 F.3d 180, 184 (3d Cir. 2008). While our review of the BIA's decision is deferential, "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." *Valdiviezo-Galdamez v. Att'y Gen.*, 502 F.3d 285, 290 (3d Cir. 2007) (citation omitted). The BIA may not ignore evidence in the record that favors the petitioner. *Espinosa-Cortez v. Att'y Gen.*, _ F.3d _, No. 08-4170, 2010 WL 2179195 at *11 (3d Cir. June 2, 2010). To reverse the BIA's finding we must find that the evidence "compels" a different result. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

> [T]he BIA's determinations will be upheld if they are supported by reasonable, substantial, and probative evidence in the record considered as a whole. Under the substantial evidence standard, the BIA's determinations must be upheld unless the evidence not only supports a contrary conclusion, but compels it. However, as just suggested, the BIA must substantiate its decisions. We will not accord the BIA deference where its findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record.

*Sheriff v. Att'y Gen.*, 587 F.3d 584, 589 (3d Cir. 2009) (internal

10

quotation marks, alterations, and citations omitted).

Here, the BIA reviewed the IJ's grant of CAT relief *de novo*. The BIA's ruling in this case was issued before we decided *Kaplun v. Attorney General*, 602 F.3d 260 (3d Cir. 2010), where we set forth a two-part standard of review for the BIA to apply in reviewing an IJ's determination of a CAT claim. *Kaplun* held that the BIA should review the IJ's factual determination of the likelihood of mistreatment under a clear error standard, and should apply a *de novo* standard of review as to whether the mistreatment would legally constitute torture. *Id.* at 272. Therefore, to reverse the IJ's ruling under *Kaplun*, the BIA would have to conclude either that the IJ clearly erred in determining the likelihood that Kang would be tortured if removed or, under a *de novo* standard, that the IJ's legal determination as to torture was wrong. Under *Kaplun*, we will uphold the BIA's reversal of the IJ's grant of CAT relief if there is substantial evidence supporting the BIA's conclusion that the IJ clearly erred in finding a likelihood of torture, or if we determine that the alleged mistreatment does not legally constitute torture. Conversely, we will reverse the BIA's determination if the evidence compels a finding that it is more likely than not that the petitioner will be tortured if removed.

The Government contends that a remand for the BIA to review the IJ's determination under *Kaplun* is unnecessary because Kang has not shown a likelihood of torture. We agree that a remand is not necessary, but for the opposite reason. We hold that the BIA's reversal of the IJ, and determination that Kang was not entitled to relief under CAT, was not supported by substantial evidence and that the record compels the opposite

11

conclusion (as a matter of fact and law).  Thus, we need not remand for the BIA to analyze the IJ's decision under the *Kaplun* standard of review.

IV.  Convention Against Torture

Kang contends that the BIA erred in reversing the IJ's grant of withholding under CAT because the evidence presented before the IJ compelled the conclusion that it was more likely than not that she would be tortured if returned to China, and because the  BIA's decision to the contrary is not supported by substantial evidence.  We agree.

The Government responds that Kang only provided evidence of substandard prison conditions in China, and "mistreatment" of some prisoners, which is insufficient to prevail on a CAT claim.  The Government urges that the BIA relied on certain factual findings by the IJ, including the fact that Kim was not tortured despite being convicted of aiding North Korean refugees, and that Kim testified "that only those prisoners who broke the prison rules were mistreated." Respondent's Br. at 25.  Additionally, the Government describes the Country Report as stating "that people arrested for harboring illegal aliens were not amongst the groups most prone to mistreatment."[2]  *Id.*

---

[2]  The Country Report states that, according to a "UN Special Rapporteur," "officials specifically targeted for abuse house church groups, Falun Gong adherents, Tibetans, and Uighur prisoners."  App. 507.  This does not indicate that those

12

The Government also notes that in *Pierre*, 528 F.3d at 189, we held that CAT "requires a petitioner to show that his prospective torturer will have the motive or purpose to cause him pain or suffering," and argues that the IJ did not make any factual findings that would support a determination of such "specific intent." Respondent's Supp. Br. at 4-5. According to the Government, Kang "failed to make a showing of specific intent to inflict pain and suffering upon her." *Id.* at 7. Instead, the Government claims that Kang's allegations are similar to claims that we rejected in two other cases involving prison conditions--*Auguste v. Ridge*, 395 F.3d 123, 146-47 (3d Cir. 2005), and *Francois v. Gonzales*, 448 F.3d 645, 651 (3d Cir. 2006)--in that Kang has not claimed "past torture or mistreatment directed specifically at her." Respondent's. Supp. Br. at 7-8.[3]

---

arrested for aiding North Koreans are unlikely to be tortured.

[3] In *Auguste* and *Francois*, the petitioners provided evidence of deplorable prison conditions in Haiti as well as beatings of prisoners by guards. We rejected the petitioners' claims that they were entitled to withholding under CAT because there was no reason to believe that the petitioners were especially likely to be targeted for mistreatment. *Pierre*, 528 F.3d at 183, 189. The deficiency in the petitioners' claims in *Auguste* and *Francois* was that they could not show that "Haitian officials will have the purpose of inflicting severe pain or suffering by placing [the petitioners] in detention upon [their] removal from the United States." *Pierre*, 528 F.3d at 190; *see also Auguste*, 395 F.3d at 153-54; *Francois*, 448 F.3d at 651-52.

13

A petitioner seeking withholding of removal under CAT must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). All evidence relevant to the possibility of future torture should be considered when assessing if a petitioner is more likely than not to be tortured if removed. *Id.* § 208.16(c)(3). The regulations set out the following definition of torture:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Deplorable prison conditions do not, by themselves, constitute torture. In contrast, Kang presented considerable evidence to support a finding of specific intent to inflict severe pain and a finding that she would be specifically targeted.

14

8 C.F.R. § 208.18(a)(1). In addition, "[i]n order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." § 208.18(a)(5). We have stated that "CAT requires a showing of specific intent before the court can make a finding that a petitioner will be tortured." *Pierre*, 528 F.3d at 189. A petitioner must demonstrate "that his prospective torturer will have the motive or purpose to cause him pain or suffering." *Id.*

We conclude that the evidence compels the conclusion that Kang has met this burden. The BIA's assessment of the evidence, as well as the Government's argument portraying the evidence as involving mere prison conditions and ignoring the inherently torturous nature of the treatment about which the witnesses testified, are inexplicable. Moreover, the BIA appears to have totally ignored the most forceful record evidence. Zheyun Jin's and Baoyu Jin's affidavits stated that, in an effort to force them to disclose the locations of other members of their organization, Chinese officials beat them, poured cold water over them, whipped them, put plastic bags over their heads to suffocate them, hung them in the air, shined bright lights into their eyes, deprived them of sleep, and shocked them with electrical current.

During her hearing, Kang similarly testified that members of her organization had been suffocated with plastic bags and beaten. Kang also testified, corroborated by her son's affidavit-- also ignored by the BIA--that when police interrogated her son about her whereabouts, they beat him, kicked him, and deprived him of sleep for several days. During Kang's hearing and in a written affidavit, Kim testified that he had heard of or observed

15

other prisoners being beaten, forced to stand for 48 hours at a time, deprived of sleep, and electrically shocked as part of interrogations regarding their involvement with the North Korean refugees. The 2007 Country Report corroborated these claims, reporting that torture in China was "widespread" and that it involved many of the methods described above. App. 506-07.

In light of this evidence, the BIA's conclusion that Kang failed to show the required likelihood of torture falls short of satisfying the substantial evidence standard; rather, it is contrary to the evidence in the record. Although we generally defer to the BIA's conclusion, the BIA may not "simply overlook evidence in the record" that supports Kang's claim. *Espinosa-Cortez*, 2010 WL 2179195 at *11. In its opinion, the BIA ignored the majority of the evidence that Kang presented, including the most telling evidence of torture, and instead mentioned only the Country Report and Kim's testimony. The BIA concluded that, even if torture occurred in Chinese prisons, Kang had not demonstrated that it was more likely than not that she would be tortured if returned to China. Significantly, the BIA did not mention the testimony of individuals who were similarly situated to Kang. Kang's situation in China is unlike Kim's because he is an American citizen. By contrast, Zheyun Jin and Baoyu Jin were named in the same arrest warrant as Kang, and Kang's son was specifically interrogated and abused in order to elicit information about Kang herself. Because the BIA relied on only Kim's testimony and the Country Report, and completely ignored the other affidavits, its conclusions are not "reasonably grounded in the record"; therefore, we owe its decision no deference. *Sheriff*, 587 F.3d at 589.

16

The record compels the conclusion that if Kang is removed to China it is more likely than not that she will be beaten, suffocated, deprived of sleep, shocked with electrical current, and/or forced to stand for long periods of time, and that this would be done with the purpose of causing her severe pain and suffering. Other individuals accused of precisely the same crime as Kang were subjected to this treatment, for the purpose of forcing them to disclose information about their organization. Moreover, her son was abused in order to elicit information about Kang herself. There is no doubt that this treatment satisfies the legal definition of torture: it involves the intentional infliction of "severe pain or suffering," "for such purposes as obtaining . . . information [from] . . . or punishing" an individual, "with the consent or acquiescence of a public official," 8 C.F.R. § 208.18(a)(1), and with "the motive or purpose to cause pain or suffering," *Pierre*, 528 F.3d at 189. The types of abuse suffered by Zheyun Jin and Baoyu Jin are not merely evidence of deplorable prison conditions. The acts themselves compel the conclusion that they were intended to inflict pain.

The Government's contentions to the contrary are utterly without merit. We are greatly troubled that the Government urges that the evidence introduced by Kang is merely evidence of substandard prison conditions. The Government completely mischaracterizes Kim's testimony on this issue. Kim's testimony was not limited to describing prison conditions. Rather, he testified that prisoners were subjected to the acts described above when they failed to disclose a satisfactory amount of information during interrogations. Furthermore, as described in detail above, Kang presented substantial evidence

17

that other individuals in her organization were tortured, and the disturbing descriptions of their interrogations compel the conclusion that the authorities acted with the purpose of inflicting serious pain and suffering. No other purpose could explain the horrific experiences detailed in the affidavits presented to the IJ.

It is disappointing, even shocking, that the government fails to acknowledge that the evidence is not only strongly in Kang's favor, but, indeed, compels the conclusion that she will likely be tortured. An attorney representing the United States "carries a double burden." *Handford v. United States*, 249 F.2d 295, 296 (5th Cir. 1958). To be sure, "he owes an obligation to the government, just as any attorney owes an obligation to his client, to conduct his case zealously." *Id*. However, at the same time he must be ever cognizant that "he is the representative of a government dedicated to fairness and equal justice to all and, in this respect, he owes a heavy obligation to [his adversary]." *Id*. Unfortunately, in this case, "zeal was permitted to outrun fairness." *United States v. Goodwin*, 492 F.2d 1141, 1147 (5th Cir. 1974). The Government, upon viewing the compelling evidence in the record, should have realized that the BIA's decision to deny Kang CAT relief was wrong and therefore ought to have come before this Court in support of Kang's petition, rather than against it. Instead, the Government sought to characterize the facts in such a way so as to distract the Court from the dire nature of Kang's plight. While our adversarial system may permit such advocacy by private parties - when the United States appears before us, it is duty-bound to "cut square corners" and seek justice rather than victory. We are distressed that it failed to do so in this case.

18

We conclude that, because the BIA ignored overwhelming probative evidence produced by Kang, its findings were not reasonably grounded in the record and thus we accord no deference to the BIA's decision. Considering the record as a whole, we find that the BIA's determination was not based on substantial evidence. Rather, the evidence instead compels the conclusion that it is more likely than not that Kang will be tortured if returned to China. While ordinarily "the proper course, except in rare circumstances, is [for an appellate court] to remand to the agency for additional investigation or explanation," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), **"[w]here application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration."** *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alterations omitted, emphasis added). The case before us is one of those "rare circumstances" where remand is not necessary, since, as set forth above, the record evidence overwhelmingly supports - and indeed, compels - the conclusion that Kang's petition for withholding of removal under CAT should be granted, and no amount of reconsideration by the BIA would change that. Accordingly, we reverse the BIA's decision, and grant Kang's petition for withholding of removal pursuant to CAT.