PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1849
_____

TEHRAM STEVE ROYE,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                        Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA 1:A038-576-174)
Immigration Judge: Hon. Walter Durling
_____

Argued
June 26, 2012

Before:   SLOVITER, CHAGARES, and JORDAN, *Circuit
Judges*.

(Filed: September 10, 2012)
_____

Megan Bremer   [ARGUED]
700 Light Street
Baltimore, MD   21230
        *Counsel for Petitioner*


Jennifer R. Khouri   [ARGUED]
Katherine Clark
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC   20044
        *Counsel for Respondent*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

Tehram Steve Roye petitions for review of a final order of the Board of Immigration Appeals (the "BIA" or the "Board") ordering him removed from the United States based on his state-law convictions for aggravated assault and endangering the welfare of a child. Roye asserts that he is entitled to deferral of removal under the United Nations Convention Against Torture ("CAT") because, if removed to his home country, he will likely be imprisoned and, with the consent or acquiescence of the Jamaican government, be subjected to torture by other prisoners and prison guards. Because the BIA erred in its review of Roye's claims, we will grant his petition for review, vacate the BIA's order of

removal, and remand the matter for further proceedings consistent with this opinion.

## I.  Background

Roye is a fifty-eight-year-old native of Jamaica, who was admitted to the United States on April 5, 1984 as the spouse of a U.S. citizen.  On April 30, 1992, he pled guilty in the Pennsylvania Court of Common Pleas to committing an aggravated assault, in violation of 18 Pa. C.S.A. § 2702(a)(1), and to endangering the welfare of a child, in violation of 18 Pa. C.S.A. § 4304.  The amended information to which he pled alleged that he had "sexual intercourse … by forcible compulsion" with his eight-month old daughter. (Administrative Record ("A.R.") at 760.)  The trial judge sentenced Roye to a term of six to twenty years' imprisonment but "strongly recommend[ed] that consideration be given to [his] immediate transfer into … [a] psychiatric [f]acility." (*Id.* at 763.)

Fourteen years after Roye pled guilty, the Department of Homeland Security ("DHS") issued a Notice to Appear ("NTA"), charging him as removable under INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), because he had been convicted of an aggravated felony under 8 U.S.C. § 1101(a)(43)(A).

### A.  *Roye's Application for Deferral of Removal*

Roye subsequently filed, on February 11, 2009, a Form I-589, Application for Asylum and Withholding of Removal, seeking deferral of removal under the CAT.  On that form, Roye stated that he "fear[s] … rape and death if returned to

3

Jamaica," and that his "mental illness gives rise to bizarre and criminal behavior that will make him a clear target for police officers and other inmates who sexually assault inmates with mental illnesses." (A.R. at 747.)

An Immigration Judge ("IJ") held a hearing on May 26, 2009, during which Roye's counsel presented three witnesses.[1] Dr. Anne Weidman testified that, after examining Roye, she diagnosed him as having schizoaffective disorder, bipolar type. She said that the nature of Roye's condition was such that he would need to take medication for the remainder of his life, but she noted that Roye often refused to take medication "outside a treatment environment." (*Id.* at 298.) Dr. Weidman also observed that Roye suffered manic and depressive episodes, and "had incidents in which he set his cell on fire and … [became] very sexually preoccupied … ." (*Id.* at 299.)

Nancy Anderson, an attorney who has practiced law in Jamaica and who was a member of the Independent Jamaican

---

[1] Roye did not testify during the May 26 hearing, though he did make a few disjointed statements that bear little relation to his petition for review but provide some insight into his overall mental condition. For example, he told the IJ, "I don't care what you say, I have perfectly got the right to initiate my children in life as a nation anytime I feel (indiscernible)." (A.R. at 281.) He also said, "don't tell me about [the] crime of sex or whatever. I know what to do to my children and how far to go, how to take it. Do you understand that?" (*Id.* at 281-82.) Finally, he said "I don't care about your ground rules. I'm asking you do you understand as a nation I have the right to initiate my children in life. Do you understand that?" (*Id.* at 282.)

Council for Human Rights,[2] also testified during the hearing. She said that many mentally ill persons in Jamaica are prosecuted for minor offenses and are incarcerated, often indefinitely. She also described the general experience of mentally ill inmates in Jamaican prisons, indicating that they are frequently subjected to physical and sexual abuse by both fellow prisoners and prison officials. She said that "the most prevalent abuse is sexual," but that mentally ill inmates also suffer other kinds of physical abuse because it "is easy to inflict on someone who is … on some medication." (*Id.* at 316-17.) Anderson believed that, if Roye were returned to Jamaica, he was "likely to be incarcerated for an indefinite period of time if he's arrested," and "would be exposed to abuse by guards and other inmates" while in prison. (*Id.* at 340-41.)

Anderson also testified regarding the extent to which Jamaican prison officials are involved in the abuse of mentally ill prisoners. When asked to describe that involvement, Anderson replied:

> a lot of complaints … are of ill treatment at the hands of these correctional officers or warders.

---

[2] Anderson testified that the Independent Jamaican Council for Human Rights (the "Council") is a non-governmental organization whose mission is to "promote and protect the human rights of citizens of Jamaica." (A.R. at 323.) She explained that the Council provides services in three areas – "human rights education, advocacy where [the Council becomes] involved in dealing with the mentally ill in the criminal justice system, and … constitutional and legal reform." (*Id.* at 324.) According to Anderson, one-third to one-half of the work of the Council involves the mentally ill.

… [T]hings are done that they must know about and they must be able to see, but they do nothing to prevent it or to assist … the mentally ill [inmates]. There are some warders … who will call me and say that this person is being abused, they don't know by who, but I should come and have a look at the situation or I should send someone to speak to them, and -- but that -- those are few and far between. I really believe that … I believe that some of the correctional officers themselves are abusing prisoners and a lot of them are turning a blind eye to what is going on.

(*Id.* at 321.)

Dr. Wendel Abel, a physician who worked "with deportees with mental illness[es] … for almost 20 years" (*id.* at 349), and whose research involved "looking at the impact [of] deportation [on] persons who are mentally ill and who have been deported to Jamaica" (*id.* at 349-50), also testified during the hearing. He said that mentally ill prisoners in Jamaica suffer "physical abuse, both by [prison] staff and also other prisoner[s,] so much so that [prison officials] have had to separate the mentally ill" from the remainder of the prison population. (*Id.* at 372-73.) He also said that mentally ill prisoners "are not allowed out at the same period of time [as prisoners who are not mentally ill] because [the] other prisoners will physically … and sexually abuse them." (*Id.* at 373.)

B.     *The IJ's June 4, 2009 Decision*

6

On June 4, 2009, the IJ found that Roye was removable due to his felony convictions, but the IJ granted Roye's request for deferral of removal under the CAT. In that decision and order, the IJ summarized the evidence of record, specifically detailing the testimony of Anderson, Abel, and Weidman. He gave particular emphasis to the testimony of Anderson and Abel, noting that they "verified that mentally ill detainees and prisoners are often sexually and physically assaulted in the Jamaican prison system because of the nature of their mental illness … ." (*Id.* at 177.) He also credited Anderson's assertion that "the high incident rate of sexual assaults against [mentally ill detainees and prisoners] is well known to the Jamaican government who essentially refuses to take the necessary action to punish the guards responsible." (*Id.*)

Based on the evidence, the IJ found that

[t]he only reasonable and fact-based conclusion … is that [Roye] will be homeless in Jamaica due to a lack of family ties there. He will decompensate due to a lack of needed medications for his anti-psychotic behavior. He has a history of violence while off his medications, and even while on the medications, continues to exhibit anti-social behavior. [Roye] at times refused to acknowledge his mental disease, and sometimes refuses to take his medicines. As Dr. Abel opined, even in the best of circumstances, which are highly unlikely to prevail, [Roye] will

7

likely be detained in prison and thereby suffer
sexual and physical assaults ... .[3]

(*Id.* at 178.) The IJ also found that the evidence demonstrated that Roye's prospective persecutors would physically and sexually assault him with "the specific intent to inflict severe pain or suffering, *i.e.* ... the goal or purpose of inflicting severe pain or suffering." (*Id.* (internal quotation marks omitted).)

### C.   *The BIA's October 29, 2009 Opinion and Order*

The DHS appealed the IJ's order, arguing that "the Immigration Court erred as a matter of law when it found [Roye] will be subject to torture by or through the acquiescence of Jamaican prison guards, if removed to Jamaica." (*Id.* at 161.) On October 29, 2009, the BIA sustained the appeal and ordered Roye to be removed.

Based on its examination of the record, the BIA concluded that Roye had failed to "[meet] his burden of establishing by a preponderance of the evidence that it is more likely than not that he would be tortured if returned to

---

[3] It is not clear what in Dr. Abel's testimony the IJ was relying on to say that Roye will likely be imprisoned. When asked "what's the likelihood of Mr. Roye ending up in a prison by being taken off the street by the police," Dr. Abel responded that Roye "probably would not end up in [a Jamaican] prison unless he has been charged for an offense" (A.R. at 370), but the doctor predicted that Roye would "probably end up homeless and more than likely ... die very soon on the street." (*Id.* at 369-70.)

8

Jamaica, either through the government inflicting or instigating the feared torture, or because the government would consent or acquiesce to such torture." (*Id.* at 118.) Significantly, the BIA "credit[ed] the testimony of [the three witnesses who testified at the May 26, 2009 hearing] and accept[ed] their testimony as an accurate depiction of what likely would occur upon [Roye's] return to Jamaica." (*Id.* at 117.) However, even crediting that testimony, the BIA determined that the evidence of record did not "establish[] that the government of Jamaica has the *specific intent* to torture [Roye], as required for a grant of deferral of removal under the [CAT]." (*Id.*) The BIA explained that, "even if Jamaican government officials were to place [Roye] in indefinite detention despite being aware that [Roye] would be likely to suffer physical and sexual abuse in prison, as maintained by [Roye's] witnesses, such action would not, by itself, establish that they possess the motive or purpose of torturing [Roye]." (*Id.*)

The BIA also rejected the assertion that the Jamaican government would consent to or acquiesce in Roye's abuse by other prisoners or prison guards. In doing so, it explained that, under the governing law, to prove that Roye will be tortured "by or through the acquiescence of Jamaican" officials (*id.* at 161), Roye would have to "do more than show that the officials are simply aware of the activity constituting torture yet are powerless to stop it" (*id.* at 117; *cf. id.* at 118 (stating that "mere willful blindness to, or deliberate ignorance of, the tortuous acts of others is insufficient to constitute acquiescence by public officials" (internal quotation marks omitted))). The BIA went on to say that Roye must show that "the public official[s], prior to the activity constituting torture, [had] awareness of such activity

9

and thereafter breached [their] legal responsibility to intervene to prevent such activity." (*Id.* at 117 (citations and internal quotation marks omitted).)

On May 26, 2010, Roye filed a petition for review of the order of removal and a motion seeking a stay of removal pending the resolution of that petition.[4] The government subsequently moved to remand the matter to the BIA to allow the BIA to reconsider Roye's petition in light of our decision in *Kaplun v. Attorney General of the United States*, 602 F.3d 260 (3d Cir. 2010). On June 4, 2010, we granted Roye's request to stay the BIA's order of removal, and on October 22, 2010, we granted the government's motion to remand.

D.    *The BIA's May 14, 2011 Opinion and Order*

On remand, a divided BIA again sustained the DHS's appeal.[5] In its March 14, 2011 opinion, the BIA observed

---

[4] On December 2, 2009, Roye filed a petition for review of the BIA's October 29, 2009 decision. We dismissed that petition as untimely on March 3, 2010. Thereafter, on March 16, 2010, Roye filed a motion with the BIA, asking the BIA to reissue its October 29, 2009 decision on the grounds of ineffective assistance of counsel, which the BIA granted on May 17, 2010. Hence, the May 26, 2010 petition was timely.

[5] One Board member dissented, arguing that remand was appropriate "for more specific fact-finding," because, "[i]n light of *Kaplun*, [there] appears to be a question of fact as to whether prison officials would commit sexual assaults on [Roye] for the specific purpose of inflicting severe pain or suffering (or would acquiesce in assaults by others for that

that, under *Kaplun*, "the question of the future likelihood of torture is a mixed one, with both a factual component (i.e., what is likely to happen to the petitioner if [he is] removed) and a legal one (i.e., does what is likely to happen amount to the legal definition of torture)." (A.R. at 3 (citations and internal quotation marks omitted).) The BIA decided that, under the standards articulated in *Kaplun*, there was "no clear error in the [IJ's] factual determination of what is likely to happen to [Roye] if he is returned to Jamaica," but the BIA "reaffirm[ed] [its] prior … determination that what is likely to happen to [Roye] upon his return to Jamaica does not satisfy the legal definition of torture for purposes of [granting] deferral of removal" under the CAT. (*Id.* at 4.)

It based that conclusion on its "determination that, upon *de novo* review, the evidence does not establish that [Roye] would be imprisoned by Jamaican authorities for the specific purpose of torturing him." (*Id.*) It said that, under *Pierre v. Attorney General of the United States*, 528 F.3d 180, 189 (3d Cir. 2008) (en banc), "proof of knowledge on the part of government officials that severe pain or suffering will be a practically certain result of an applicant's detention does not

_____

purpose)." (A.R. at 5.) The dissenting Board member argued that the IJ had not explained why Roye satisfied the CAT's specific intent requirement. Although the dissenter said, "[s]ome evidence in the record suggests that sexual assaults are committed on prisoners who are less likely to report the abuse," he went on to say that the evidence does not shed light on "whether such assaults are committed to satisfy the sexual urges of the offenders (regardless of the level of harm to the victims) or whether the specific goal of the assault[s] is to inflict severe pain or suffering." (*Id.*)

11

satisfy the specific intent [requirement] of the [CAT]." (*Id.*) Rather, the BIA stated, "the specific intent requirement requires an applicant to show that his prospective torturer will have the motive or purpose to cause him pain or suffering." (*Id.*) The BIA also rejected the assertion that Jamaican prison officials would consent to or acquiesce in Roye's mistreatment. That conclusion was based on its understanding that the evidence Roye offered that Jamaican prison "officials … turn[] a blind eye" to the physical and sexual abuse of mentally ill prisoners was insufficient to prove that "the Jamaican government possesses the requisite specific intent to torture [Roye] … ." (*Id.*; *see id.* (noting that "mere willful blindness to, or deliberate ignorance of, the torturous acts of others is insufficient to constitute acquiescence by public officials" (internal quotation marks omitted).)[6]

---

[6] The BIA also briefly addressed whether another intervening decision, *Kang v. United States Attorney General*, 611 F.3d 157 (3d Cir. 2010), affected Roye's case. It determined that *Kang* did not alter its October 29, 2009 decision because, unlike the petitioner in that case, who offered "affidavits from similarly situated individuals, including members of her organization, detailing their detention and torture, and testimony and an affidavit concerning police beatings and [the] torture of her son to elicit information about the alien," Roye failed to "provide[] affidavits or substantially similar evidence that would serve to establish that the government of Jamaica would imprison [him] with the specific intent of torturing him." (A.R. at 5.)

Roye timely petitioned for review of the BIA's March 14, 2011 decision.[7]

## II.    Jurisdiction and Standard of Review

Because the basis for Roye's removal is his conviction for an aggravated felony, "our jurisdiction is limited under the REAL ID Act 'to constitutional claims or questions of law'" raised by his appeal. *Catwell v. Att'y Gen.*, 623 F.3d 199, 205 (3d Cir. 2010) (quoting 8 U.S.C. § 1252(a)(2)(D)). The phrase "questions of law" refers to purely legal inquiries such as those involved in statutory interpretation, *Jarbough v. Att'y Gen.*, 483 F.3d 184, 189 (3d Cir. 2007), or inquiries into "whether the BIA used the correct standard in reviewing the IJ's decision and whether [the BIA] assigned to [the petitioner] the correct burden of proof," *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006). "[C]onstitutional claims," constitute, at minimum, "colorable violation[s] of the United States Constitution." *Jarbough*, 483 F.3d at 189. "[F]actual or discretionary determinations are outside of our scope of review." *Pierre*, 528 F.3d at 184.

We review *de novo* the constitutional and legal questions raised by Roye's petition, *Yusupov v. Att'y Gen.*, 650 F.3d 968, 977 (3d Cir. 2010), though our review is "subject to the principles of deference articulated in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984)," *Pierre*, 528 F.3d at 184. Because the BIA did not summarily affirm the IJ's order but instead issued a separate

---

[7] On September 9, 2011, the government filed a motion to remand, along with its answering brief. We denied the government's motion to remand on October 6, 2011.

opinion, we review the BIA's disposition and look to the IJ's ruling only insofar as the BIA deferred to it. *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006).

## III. Discussion

Roye's petition for review requires us to answer the following legal questions: whether the BIA correctly applied the law in reviewing the IJ's finding that Roye will be physically and sexually assaulted in a Jamaican prison by prisoners and prison guards who specifically intend to cause him pain or suffering; and whether the BIA applied the correct legal standard in reviewing the IJ's finding that it is more likely than not that Jamaican public officials will consent to or acquiesce in assaults on Roye.[8] The answers to

---

[8] Presumably in response to the dissenting Board member's opinion, *see supra* note 5, Roye also argues that the specific intent to inflict severe pain or suffering is endemic to prison rape and that any such rape must therefore be seen as an act of torture, (Petitioner's Opening Br. at 6 ("Mr. Roye argues that acts of sexual assaults, especially rape, in prison constitute torture… ."); Reply Br. at 12 (noting that "[p]ursuit of [t]he question of whether sexual assault is primarily about sexual gratification or power and control … . would be inappropriate because neither possibility should undermine [Roye's] argument that the sexual violence [in prison] and its consequences would be specifically intended."); *id.* (noting that "the severe pain and suffering [endemic to rape] cannot merely be an accidental consequence" of rape)). While we certainly agree with Roye that rape is a reprehensible and all-too-common crime, the regulatory definition of "torture" for purposes of applying the CAT appears to undermine his

these questions turn largely on the language of the CAT and its implementing regulations, as well as our precedents.

---

demand for a rule that assumes the specific intent of all rapists. *See Pierre*, 528 F.3d at 189 (holding that "[k]nowledge that pain and suffering will be the certain outcome of conduct may be sufficient for a finding of general intent but it is not enough for a finding of specific intent," which is a prerequisite to relief under the CAT); *Zubeda v. Ashcroft*, 333 F.3d 463, 473 (3d Cir. 2003) (observing that "[t]he severe pain and suffering endemic to rape is a necessary but not sufficient element of torture under the [CAT]" and that the intent of the rapist has to be considered). Ultimately, however, it is unnecessary for us to reach this issue. Although the BIA's opinion is not entirely clear, it seemed to accept the IJ's finding that Roye's "prospective [persecutors]" would physically and sexually assault him with "the specific intent to inflict severe pain or suffering, *i.e.* … the goal or purpose of inflicting severe pain or suffering." (A.R. at 178 (internal quotation marks omitted); *see id.* at 4 (noting the BIA's conclusion that there was "no clear error in the [IJ's] factual determination of what is likely to happen to [Roye] if he is returned to Jamaica")). The dissenting Board member questioned whether the IJ's statement to that effect was adequately supported, *see supra* note 5, but, for purposes of this appeal, we assume that the factual statement regarding specific intent is sound. Accordingly, Roye's "all-rape-is-torture" argument, while raising important public policy issues, need not be addressed.

A.    *The CAT*

The CAT prohibits any signatory State from "expel[ling], return[ing] … or extradit[ing] a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. The treaty became binding upon the United States when President Clinton delivered the ratifying documents to the U.N. in 1994. U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995). It thereafter became "'the policy of the United States not to expel … or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture … .'" *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007) (alterations in original) (quoting Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note)).

Article I of the CAT defines torture as:

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or

16

acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Art. 1(1), S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Under regulations promulgated by the United States Department of Justice,[9] an alien who, like the petitioner here, seeks relief under the CAT, bears the burden of proving "that it is more likely than not that he or she [will] be tortured if removed … ."[10] 8 C.F.R. § 208.16(c)(2); *see Auguste v.*

---

[9] The FARRA implements the CAT. Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note). Pursuant to the FARRA, the Department of Justice promulgated regulations that govern the procedures by which aliens may obtain relief from removal under the CAT. *See* 64 Fed. Reg. 8478 (Feb. 19, 1999), codified at 8 C.F.R. §§ 208.16(c), .17, & .18(a) (2004).

[10] The regulations, which parallel the definition of torture in Article I of the CAT, define "torture" as

[a]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of

*Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) ("[I]n evaluating [petitioner's] claim that he is entitled to relief under the [CAT], we must apply the 'more likely than not' standard contained in 8 C.F.R. § 208.16(c)(2)."); *Sevoian v. Ashcroft*, 290 F.3d 166, 174-75 (3d Cir. 2002) (same). Thus, an alien can show that he is entitled to relief under the CAT by proving that "it is more likely than not" that his persecutors will commit an act that causes severe physical or mental pain or suffering; that the pain or suffering will be intentionally inflicted; that it will be inflicted for an illicit or proscribed purpose; that it will be inflicted by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the alien; and that the pain or suffering does not arise from lawful sanctions. *Auguste*, 395 F.3d at 151. If a petitioner demonstrates that he will be subjected to torture "by or at the instigation of or with the consent or acquiescence of" a public official, 8 C.F.R. § 208.18(a)(1), then "withholding of removal or deferr[al] of removal is mandatory," *Silva-Rengifo*, 473 F.3d at 64 (citing 8 C.F.R. §§ 1208.16-.18.).

### B. *The Physical and Sexual Abuse of Mentally Ill Prisoners in Jamaican Prisons*

The IJ stated that the widespread physical and sexual abuse of mentally ill inmates in Jamaican prisons was specifically intended to cause severe pain and suffering. The BIA did not disagree with that conclusion (*see* A.R. at 4

---

> or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

18

(accepting that there was "no clear error in the [IJ's] factual determination of what is likely to happen to [Roye] if he is returned to Jamaica")), but went on to reject Roye's request for CAT relief because, *inter alia*, Roye had not demonstrated that he would "be imprisoned by Jamaican authorities for the *specific purpose* of torturing him," (*id.*).  Roye contends that it was error for the BIA to focus on the intent of Jamaican public officials who decide to imprison someone with mental illness, instead of focusing on whether the physical and sexual abuse that mentally ill prisoners experience is intended to cause pain and so may qualify as torture.  He is correct.

During the May 26, 2009 hearing before the IJ, Roye offered the testimony of expert witnesses who opined that, if removed, he will be imprisoned and will be physically and sexually assaulted by guards and other inmates.  Specifically, Roye offered the testimony of Anderson, who said that mentally ill prisoners are frequently the victims of sexual abuse because they are easy targets for sexual predators (A.R. 316-17), as well as the testimony of Dr. Abel, who said that the physical and sexual abuse of mentally ill inmates in Jamaican prisons is so pervasive that those inmates must be separated from the rest of the prison population (*id.* at 372-73).  The IJ credited that testimonial evidence and concluded that, if removed, Roye would indeed be imprisoned[11] and subjected to physical and sexual abuse by people specifically intending to cause him severe pain and suffering.  The BIA, as noted, did not disagree with those factual findings.

---

[11] As noted, *supra* note 3 and accompanying text, the IJ found that, if removed to Jamaica, Roye would likely stop taking his medications and, in his deteriorating mental state, would end up in prison.

Nevertheless, battling a strawman, it rejected Roye's CAT claim based on the fact that there was no indication that Roye would be imprisoned "by Jamaican authorities for the *specific purpose* of torturing him." (*Id.*)

No one had raised the question of Jamaican authorities' intent regarding imprisonment because it is beside the point Roye was endeavoring to make. Yet that is where the BIA chose to center its attention, saying, "proof of knowledge on the part of government officials that severe pain or suffering will be a practically certain result of an applicant's detention does not satisfy the specific intent [requirement] of the [CAT] … ." (*Id.*) By concentrating its inquiry on whether the act of detaining mentally ill deportees is an act of torture, rather than on whether the physical and sexual abuse of mentally ill prisoners that occurs in Jamaican prisons rises to the level of torture, the BIA incorrectly analyzed Roye's claim for relief. Thus, although the BIA articulated the correct legal standard for specific intent in a CAT case, *see Pierre*, 528 F.3d at 189 (holding that specific intent requires more than "proof of knowledge on the part of government officials that severe pain or suffering will be the practically certain result" of the actions challenged as torture), it applied it to the wrong question, ignoring the IJ's finding on specific intent and bypassing consideration of whether the physical and sexual assaults that Roye is likely to experience during a term of incarceration in a Jamaican prison rise to the level of torture under the CAT.

By focusing on the intent of public officials who may decide to imprison Roye, the BIA failed to attend to Roye's actual argument regarding the intent of those who will likely

20

assault him. That failure requires us to grant Roye's petition for review.

### C. *Alleged Consent to or Acquiescence in Acts of Torture*

Roye contends that he is also entitled to relief under the CAT because Jamaican officials have turned a blind eye to the pervasive assaults in their prisons and are thus consenting to or acquiescing in torture. He argues that, in this instance, the BIA understood the question but applied the wrong legal standard. More specifically, he contends that the BIA erred in holding that "mere willful blindness to, or deliberate ignorance of, the torturous acts of others is insufficient to constitute acquiescence by public officials." (Petitioner's Br. at 24 (citation and internal quotation marks omitted).) Roye also argues that the BIA inappropriately conflated the *mens rea* necessary to prove that public officials consent to or acquiesce in acts of torture with the *mens rea* necessary to prove that public officials themselves have committed acts of torture. He is correct on both counts.

Under the CAT and its implementing regulations, in order to prove that a public official will consent to or acquiesce in torture, an alien must demonstrate that "the public official, prior to the activity constituting torture, [had] awareness of such activity and thereafter breach[ed] his or her legal responsibility to intervene to prevent such activity."[12]  8

---

[12] Roye also asserts that because "acts committed in government custody *must* implicate either direct commission or acquiescence by the government," the BIA erroneously concluded that the evidence fails to demonstrate that

C.F.R. § 1208.18(a)(7). Although that language suggests that public officials must have actual knowledge of torture for it to be said that they consent to or acquiesce in it, we held in *Silva-Rengifo* that "the [CAT's] definition of 'acquiescence' includes both actual knowledge and 'willful blindness.'" 473 F.3d at 68. We reasoned that a showing of willful blindness[13]

---

Jamaican public officials will consent to or acquiesce in his torture. (Petitioner's Br. at 30.) We lack the authority to address that issue, however, because whether Jamaican public officials will consent to or acquiesce in his torture is essentially a factual question. In *Kaplun*, we made that much clear by holding that the BIA committed an error of law by reviewing the IJ's finding that "public officials would consent or acquiesce to [the] mistreatment of [the petitioner]" under the *de novo* standard of review instead of the clearly erroneous standard of review. 602 F.3d at 272 (internal quotation marks omitted). Thus, even if the BIA's factual findings regarding the issue of government consent or acquiescence are clearly erroneous, we do not have jurisdiction to say so.

[13] Although we explained that willful blindness is sufficient to demonstrate government consent to or acquiescence in torturous activity, we did not detail what we meant by the term "willful blindness." In *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011) the Supreme Court described "willful blindness" as follows:

> [C]ourts applying the doctrine of willful blindness hold that defendants cannot escape the reach of … [the law] by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the

is sufficient to demonstrate government acquiescence in torture because "[e]vidence that officials turn a blind eye to certain groups' torturous conduct is no less probative of government acquiescence" than evidence that such officials participate in acts of torture. *Id.* at 70. Thus, under *Silva-Rengifo*, acquiescence to torture can be found when government officials remain willfully blind to torturous conduct and thereby breach their legal responsibility to prevent it. *Id.*

Here, the BIA relied on a contrary understanding of the law. In its May 14, 2011 opinion, it accepted the IJ's

circumstances. The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge.

…

[A] 1962 proposed draft of the Model Penal Code, which has since become official, attempted to incorporate the doctrine [of willful blindness] by defining knowledge of the existence of a particular fact to include a situation in which a person is aware of a high probability of the fact's existence, unless he actually believes that it does not exist. … [E]very Court of Appeals – with the possible exception of the District of Columbia Circuit … has fully embraced willful blindness, applying the doctrine to a wide-range of criminal statutes.

*Id.* at 2068-69 (alteration deleted) (citations and internal quotation marks omitted).

23

factual finding that Jamaican prison officials "turn[] a blind eye to" the physical and sexual abuse of mentally ill prisoners. (A.R. at 4 (citation and internal quotation marks omitted).) The BIA also said, however, that willful blindness is insufficient to prove government consent to or acquiescence in torture. It thus concluded that Roye had failed to demonstrate that Jamaican public officials will, for purposes of the CAT, be culpable for any assault he is likely to suffer in prison. That holding ignores the import of *Silva-Rengifo* and was therefore error.

The error of applying an incorrect rule of law was compounded when the BIA conflated the *mens rea* requirement pertaining to those who commit acts of torture (*i.e.*, specific intent) with the minimum *mens rea* requirement pertaining to those who consent to or acquiescence in acts of torture committed by others (*i.e.*, willful blindness). As noted above, the BIA acknowledged that the record contained evidence that Jamaican officials deliberately ignore the rape of mentally ill prisoners. Nevertheless, the BIA said that evidence of the government's willful blindness is insufficient to demonstrate "that the Jamaican government possesses the requisite specific intent to torture." (*Id.* at 2.) The BIA thus confused two distinct elements of a claim for relief under the CAT – *i.e.*, torture versus consent to or acquiescence in torture – and further confused the mental states associated with each. *See Auguste*, 395 F.3d at 151 (explaining that an alien seeking relief under the CAT must show both that "severe physical or mental pain or suffering" will be "intentionally inflicted" and that it will be inflicted "by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim"). Again, Roye adduced evidence tending to prove

24

that, if removed, he will be physically and sexually assaulted in prison and that Jamaican prison officials will turn a blind eye to that severe mistreatment. Instead of examining those two issues separately, as controlling precedent requires, *see id.*, the BIA mixed them together, saying that evidence that the Jamaican government is willfully blind to the mistreatment of mentally ill prisoners could not prove specific intent to cause pain and suffering.[14] Merging those

---

[14] The specific intent and willful blindness inquiries are not necessarily unrelated. To be culpable under the CAT, government officials must, at a minimum, be willfully blind to "activity constituting torture" 8 C.F.R. § 208.18(a)(7), so it may not be enough for someone seeking CAT relief to say that officials are willfully blind to rape. In some fashion the evidence may have to support the conclusion that the officials are willfully blind to rape that constitutes torture. *Cf. Silva-Rengifo*, 473 F.3d at 68 n.8 (noting that the drafting history of the CAT includes "text suggested by the United States [which] would have defined 'public official' … to include those who 'fail to take appropriate measures to prevent or suppress torture when such person has knowledge or should have knowledge that torture has or is being committed and has the authority or is in a position to take such measures … .'" (quoting J. Herman Burgers & Hans Danelius, The United Nations Convention Against Torture 4-42 (1988))); *id.* (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003), for the proposition that "Congress has made clear that the correct inquiry under the Convention is whether an applicant can show that public officials demonstrate 'willful blindness' to the torture of their citizens by third parties."). In other words, some intent evidence associated with the alleged rapes may be required. *Cf. Zubeda*, 333 F.3d at 473 (observing that

inquiries was an error of law that requires us to grant Roye's petition for review.[15]

---

"[t]he severe pain and suffering endemic to rape is a necessary but not sufficient element of torture under the [CAT]" and that the intent of the rapist has to be considered). We do not, however, need to decide that question in this case.

[15] Roye also contends that the BIA erred by failing to conduct the three-step inquiry articulated in *Abdulai v. Ashcroft*, 239 F.3d 542 (3d Cir. 2001), before denying his application for deferral of removal on the grounds that he failed to present sufficient corroborating evidence in support of his claim for relief under the CAT. (Petitioner's Br. at 25.) We disagree. Roye's argument is predicated upon a fundamental misunderstanding of the BIA's opinion. As the government correctly notes in its brief, the BIA did not sustain the DHS's appeal because Roye failed to corroborate his own testimony or the testimony of one of the witnesses who testified during the May 26, 2009 hearing. Instead, the BIA said that Roye failed to put forth "affidavits or substantially similar evidence that would serve to establish that the government of Jamaica would imprison [him] with the specific intent of torturing him." (A.R. at 5.) The BIA distinguished his case from that of the petitioner in *Kang*, who offered "affidavits from similarly situated individuals … detailing their detention and torture, and testimony and an affidavit concerning police beatings and [the] torture of her son to elicit information about the" petitioner, (A.R. at 5). In other words, the BIA did not say that Roye failed to corroborate his claim – it just made clear that Roye failed to put forth evidence sufficient to satisfy the CAT's specific intent requirement, as the petitioner did in *Kang*. Thus, even if none of the testimonial or documentary evidence that Roye

## IV.     Conclusion

Because the BIA answered the wrong question and applied an incorrect legal standard in reviewing Roye's claims for deferral of removal under the CAT, we will grant his petition for review, vacate the BIA's May 14, 2011 opinion and order, and remand the matter to the BIA. On remand, the BIA should review the IJ's conclusion that the evidence of record demonstrates that Roye's persecutors will physically and sexually abuse him in a manner that rises to the level of torture under the CAT, and decide whether Jamaican public officials will consent to or acquiesce in any such abuse.[16]

---

presented to the IJ required corroboration, the BIA decided that the evidence did not prove that the Jamaican government would imprison Roye with the specific intent to cause him pain or suffering. As we have already described, that ruling is flawed, but not because, as Roye argues, the BIA's conclusion "departs from the required three-step inquiry [articulated in *Abdulai*] by creating an additional requirement for a specific type of evidence." (Petitioner's Br. at 25.)

[16] In its Answering Brief, the government argues that remand is appropriate to give the BIA the opportunity to "analyze, in light of *Yusupov*, 650 F.3d 968, whether the immigration judge's finding regarding specific intent was a finding of fact, subject to clear error review." (Respondent's Br. at 17.) However, because remand is appropriate due to the legal errors discussed above, we do not address the government's assertion that we should remand to allow the BIA to determine whether the IJ's finding that Roye's oppressors will physically and sexually abuse him with the

specific intent to cause him pain or suffering is a finding of fact.